[No. 21636. Department One. April 22, 1929.]

WASHINGTON DEHYDRATED FOOD COMPANY, *Respondent,*
v. TRITON COMPANY, *Appellant.*[1]

*W. Harold Hutchinson* and *Arthur H. Hutchinson,*
for appellant.

*Grinstead, Laube & Laughlin* and *R. John Lichty,*
for respondent.

TOLMAN, J.—This is an action to recover for failure
to deliver merchandise alleged to have been purchased
by the plaintiff from the defendant under a written
memorandum, duly signed by the party to be charged.
The case was tried to the court sitting without a jury,
resulting in findings favorable to the plaintiff, and a

[1]Reported in 276 Pac. 562.

judgment thereon for $2,472.96 and costs, from which judgment the defendant has appealed.

The controlling facts are substantially as follows: On July 29, 1927, a Mr. Cardiff, the president of the respondent corporation, met Mr. Pettigrew, the secretary and managing officer of the appellant corporation, at a meeting of the Northwest Dried Fruit Association at Portland, Oregon. It developed that Mr. Cardiff desired to purchase dried apples for his company, and that Pettigrew's company had some to sell. As a result of the conversation then had between them, Mr. Cardiff prepared, and Mr. Pettigrew then signed, a memorandum or option agreement as follows:

Portland 7/29/27

To Washington Dehydrated Food Co.—We grant option until noon Aug. 2nd 2 cars apples at 10¾c per pound fob Omak basis extra choice 50s, 1 car October & one car November shipment, less 2% & 5% strapping included.         G. V. Pettigrew.

Mr. Cardiff, taking the option with him, returned to his place of business in Yakima, Washington, placed the option in his safe, and left at once for his branch office in Wenatchee. From there, on the morning of August 2, Mr. Cardiff, by telephone, called his Yakima office and dictated to his stenographer there a telegram, and a letter confirming the telegram, to appellant at its place of business in Seattle, Washington, in which he accepted and closed the option, and in the letter repeated its terms. No question is raised as to the sufficiency or timeliness of the acceptance.

On receipt of the telegram in Seattle, and on the same day, the appellant wrote respondent at Yakima acknowledging timely receipt of the telegram of acceptance and suggested,

"P. S. If you will let us have regular rail contract duly filled in, we will sign same on receipt,"

and enclosed what was called a confirmation of sale in which, for the first time, in writing, appeared a sug-

gestion of any conditions which would excuse full delivery. That suggestion was:

"This sale is understood to be a resale of a certain contract between the Triton Company and The Omak Evaporator Co. (C. R. Plumb) Omak, Washington, dated July 1st, and is subject to deliveries received under this contract."

This letter, with the enclosed confirmation of sale, was probably received in Yakima on August 3, Mr. Cardiff being still absent in Wenatchee at the time of its receipt. At or about that time, but in the absence of Mr. Cardiff, the stenographer in the Yakima office of the respondent prepared a contract on the form of the Northwest Dried Fruit Association, dated it August 2, 1927, and inserted therein the following:

"Note—This contract is understood to cover a resale of a certain contract between the Triton Company and The Omak Evaporator Co. (C. R. Plumb) Omak, Washington, dated July 1st, and is subject to deliveries received under this contract."

The contract was signed in the name of the respondent by the stenographer alone, was by her forwarded to appellant in Seattle, and when received by appellant was accepted and signed by it.

The parties sharply disagree as to whether the stenographer at the time she drew this contract was in possession of appellant's letter and confirmation of sale and copied therefrom the condition which we have quoted, without any authority so to do from the respondent; or, as contended by appellant, that she obtained the necessary information from the respondent's files, or from Mr. Cardiff, and that her act in inserting this condition and signing the contract was duly authorized. This issue will be later discussed.

Mr. Cardiff returned to his Yakima office about August 8, at once examined his office file relating to this

matter, ascertained what had been done by the stenographer in his absence, and immediately wrote to the appellant repudiating the contract as prepared and signed by the stenographer; and thereupon the controversy leading to this litigation at once arose.

A partial carload of dried apples was shipped, received and paid for in October. No further deliveries were ever made, and this action was brought, based upon a pleaded custom of the trade to the effect that a minimum carload was fifty-five thousand pounds, net, when no other amount was specifically stated. The recovery was based upon the shortage in the October shipment and the entire failure to make a November shipment.

The appellant raises the questions of the sufficiency of the writing to constitute a valid contract; a pleaded intent on its part merely to assign its rights under a contract which it then held, and a confirmation of this intent by the contract signed and mailed by respondent's stenographer; or, in the alternative, that the minds of the parties did not meet and there was no contract.

█ It is first contended that the written option is too vague, indefinite and incomplete to create a contract and that, unless it be added to and enlarged by parol testimony in defiance of the well settled rule, it is so incomplete as to be unenforceable.

Of course, under the statute of frauds, the writing must contain all of the essentials, none of which can be supplied by parol, though abbreviations and technical and trade terms may be by parol interpreted and explained. *Nut House v. Pacific Oil Mills*, 102 Wash. 114, 172 Pac. 841; *Moses Land Scrip & Realty Co. v. Stack-Gibbs Lumber Co.*, 56 Wash. 529, 106 Pac. 207; *Gile v. Tsutakawa*, 109 Wash. 366, 187 Pac. 323, and cases there cited.

The writing is signed by the party to be charged, since appellant admits that Pettigrew was its managing officer and was acting for it in the matter. Indeed, no contention is made that the writing is insufficient in that respect.

The subject matter is expressed in "2 cars apples." Appellant questions whether green apples or dried apples is meant. Even to us, without special trade knowledge, it rather clearly appears that green apples were not intended; since, when dealt in by carload lots, they are not sold by the pound; and even if so, not at such a price per pound.

Witnesses familiar with the trade were permitted to testify that, in the dried fruit trade, the term meant "ring dried apples" and was a term customarily so used; that, if any other kind or grade of dried apples had been intended, under well known usages, it would be necessary to so specify; that, without further specification, any one familiar with the trade would know immediately that, by the term used, ring dried apples were intended.

It is not disputed that "fob Omak" means that the purchaser will pay freight from Omak. The same witnesses likewise made it clear that "50s" meant that the prices were based upon the fruit being packed in 50 pound boxes, and that also seems not to be disputed.

In fact, the only uncertainty and the only point as to the meaning of the writing which is seriously in dispute is, How much is a car or carload?

The complaint pleads a custom of the trade to the effect that, when no amount is specified, a car or carload means a minimum of fifty-five thousand pounds, net. There was a conflict in the evidence on this point, but after a reading of all of the testimony, we are convinced that it supports the finding of the trial court which upholds the allegation of the complaint.

All of the other terms of the writing seem so clearly definite and understandable, without the necessity for expert interpretation, that we feel it to be unnecessary to prolong this discussion.

The mere fact that one of the parties may have contemplated that a more formal written contract would be entered into does not, under the conditions already pointed out, seem to make this writing a mere offer, or a step in the negotiations only. Being a complete and enforceable contract in which the minds of the parties had met on every essential condition, it was binding upon both alike.

A more serious question is presented by the correspondence and so-called confirmatory contracts. Mr. Pettigrew testified that at, or immediately after, signing the writing, he informed Cardiff that his company held a contract for two carloads of apples; that he proposed only to sell the contract and not to guarantee delivery. This is categorically denied by Mr. Cardiff. The terms of the contract tend to corroborate the denial, since, if the agreement had been as Mr. Pettigrew contends, the writing should properly have so specified. Assuming, as we must, that Mr. Pettigrew was mistaken in that respect, then Mr. Cardiff, his stenographer, and his office force and office files, knew nothing and contained no record of any such a condition. That being true, the information from which the stenographer made the note on the contract prepared by her, could have come only from the confirmation of sale mailed to respondent's office by the appellant while it was in her charge and while Mr. Cardiff was absent. The similarity of wording in the two instruments strongly supports this view.

If, then, the stenographer placed that provision in the contract at the instance of the appellant without the knowledge or consent and without any authority

from the respondent, then the respondent was within its rights in promptly repudiating the condition as soon as it obtained knowledge of what had been done.

We are convinced that the judgment is right, and it is therefore affirmed.

MITCHELL, C. J., HOLCOMB, FULLERTON, and BEALS, JJ., concur.