GEORGE T. PRIEST, Respondent, v. JOHN G. OEHLER, JESSIE B. P. OEHLER, CRYSTAL BEACH, INC., WILLIAM H. SMITH and NELSON CUNLIFF, Defendants; JOHN G. OEHLER and JESSIE B. P. OEHLER, Appellants.—41 S. W. (2d) 783.

Division One, September 5, 1931.

*Wurdeman, Stevens & Hoester* and *A. H. Kerth* for appellants.

*Thomas Bond* for respondent.

RAGLAND, J.—This case comes to the writer for an opinion on reassignment. It is a suit in equity by a co-maker of six negotiable promissory notes to compel the holders of said notes, the payees therein, to surrender them to the makers, pursuant to the terms of an alleged oral contract entered into between the parties in substitution of the one evidenced by the notes. On the trial *nisi* a decree was entered in favor of plaintiff, awarding the relief prayed. The holders of the notes, defendants, bring the cause here on appeal. The facts necessary to an understanding of the questions presented will be set forth as tersely as may be.

Prior to August 12, 1926, the Crystal Lake Beach, Inc., through some arrangement with John G. and Jessie B. P. Oehler, the owners of approximately 160 acres of land in St. Louis County known as Crystal Lake Park, had at considerable cost erected on said land suitable improvements and were operating the same as an amusement park. In making the improvements and otherwise equipping the premises for an amusement resort, the Crystal Lake Beach, Inc., incurred an indebtedness to Nelson Cunliff and William H. Smith, contractors, in the sum of $50,000; and to Judge Priest, respondent's father, for money loaned, in the sum of $10,000. While so indebted the corporation was compelled through insolvency to suspend operations. Thereupon a conference, participated in by respondent, Cunliff, Smith and Mr. Alfred H. Kerth, an attorney representing the Oehlers, was had for the purpose of devising ways and means for refinancing the enterprise. Pursuant to an agreement reached at such conference, respondent, Cunliff and Smith organized a new corporation, the Crystal Beach, Inc., with a capital stock of $2,000; the Oehlers then conveyed to this corporation the property known as Crystal Lake Park for a named consideration of $243,000; the corporation thereupon executed a deed of trust on the property to secure the payment to the Oehlers of $237,000, evidenced by thirteen principal notes, also executed by it; the first six of these notes, each being for $5,000, drawn to fall due serially at periods of one year, were endorsed in blank by respondent, Cunliff and Smith. The notes were all dated August 12, 1926, and each bore interest at the rate of six per cent per annum, payable semi-annually. No cash passed; the giving of the thirteen notes and the deed of trust constituted the entire consideration of the conveyance.

It was thought by all of the parties, including the Oehlers, that through the scheme of refinancing just described they could sell

the property at a sum sufficient to enable the owners to realize a satisfactory price for their land, and the creditors of the Crystal Lake Beach, Inc., Judge Priest and Cunliff and Smith, to recoup their losses. They had reasonable grounds for believing at that time that Crystal Lake Park could be sold to the Automobile Club of St. Louis for $300,000. They failed, however, to effect a sale.

The Crystal Beach, Inc., having no assets or property of any kind, except the land covered by the deed of trust, defaulted as a matter of course in the payment of the first installments of interest falling due February 12, 1927. The Oehlers, the holders of the notes, thereupon caused the trustee to advertise the land for sale pursuant to the terms of the deed of trust. Pending the publication of the notice of sale, respondent, George T. Priest, endeavored to reach an understanding with Kerth, representing the Oehlers, as to the priorities of the notes secured by the deed of trust that would be recognized in the application of the proceeds of their sale to their payment. Respondent contended that, under the rule which obtains in this State, the proceeds of the sale upon foreclosure should be applied to the payment of the notes in the order in which they respectively became due. To this Kerth would not agree. Following further futile attempts to readjust or settle the liabilities of respondent, Cunliff and Smith, as endorsers of the first six notes secured by the deed of trust, a conference was held at the office of Kerth in Clayton, St. Louis County, on the 17th day of March, 1927— the foreclosure sale was advertised to take place March 19, 1927. There was present at the conference the Oehlers and their attorney, Kerth, respondent, Smith and a Mr. Newbold, representing Cunliff.

Up to this point there is no serious controversy as to the facts. Respondent's version of what occurred at the conference, based on the testimony of himself and that of Smith and Newbold who were called by him as witnesses, will be given first.

At the opening of the conference respondent announced that he had prepared and intended to file in the circuit court, unless they were able to arrive at a settlement, a bill in equity asking foreclosure of the deed of trust, the application of the proceeds of the sale under such foreclosure to the payment of the notes in the order in which according to their tenors they respectively became due, and for the appointment of a receiver to take charge of the property pending the hearing, decree and sale. In that connection he said to Mr. Oehler that such litigation might tie up the property indefinitely. Oehler said that he was anxious to have immediate possession and expressed the view that a settlement could be reached. Following these preliminary statements the parties entered upon the negotations of the terms of a settlement intended as a release of respondent, Cunliff and Smith from their several personal liabilities as endorsers of

the six notes. As a result of such negotations respondent, Cunliff and Smith obligated themselves: (1) To pay to the Oehlers $2,000 to reimburse them for the dishes, furniture and other equipment in the buildings on the premises which had been broken, destroyed or carried away; (2) to pay all delinquent or past-due taxes against the property; (3) to formally release all liens which Cunliff and Smith had or might have against the premises on account of labor and material furnished in making the improvements thereon; (4) to pay a reasonable attorney's fee covering Kerth's services to the Oehlers in connection with the settlement; (5) to pay all outstanding electric light bills owing by the Crystal Beach, Inc.; (6) to deliver to the Oehlers a bill of sale for lumber on the mortgaged premises of the value of $1300; (7) to furnish a good and sufficient bond, protecting the Oehlers from any loss of money or property as a result of bankruptcy proceedings then pending against the Crystal Lake Beach, Inc., and to save them harmless from all court costs and expenditures that might be incurred by reason of those proceedings; and (8) to refrain from filing their proposed bill in equity and from bidding on the mortgaged property at the impending foreclosure sale. During the negotiations both respondent and Kerth made a note of each of the foregoing items as it was tentatively agreed to. At the conclusion respondent turned to Mr. Oehler and asked, "Do you now agree to those things?" In answer he said, "Yes, I do." He then turned to Mrs. Oehler and asked her the same question and she answered, "Yes." Oehler then said: "I have made a very reasonable settlement with you boys, but Smith and Cunliff have lost $50,000 there and I got the advantage of it and I don't want them to be hurt any more." Respondent then said to Kerth, "You can draw up what we have agreed to here and send me a copy and I will sign it."

The contention of the appellants (the Oehlers) as to what was said and done at the conference rests upon their testimony and that of their attorney, Mr. Kerth. The substance of Kerth's testimony as to what took place is that all of the stipulations above mentioned were tentatively agreed to, but that they were to be embodied in a written memorandum and submitted to the Oehlers for their approval and signatures. Mr. Oehler on the witness stand had no very clear recollection of what occurred at the conference; he recalled that there was a lengthy discussion with reference to the items above mentioned, but could not remember the details. He did, however, distinctly remember that he told his attorney in the presence of the others to put the proposed agreement in writing, and if he and his wife were satisfied with it, they would sign it; otherwise, they would not. Mrs. Oehler could remember nothing at all, except that

"Mr. Oehler instructed you (Kerth) to make a memorandum of what transpired and if satisfactory to him he would sign."

On the day of the conference, and after the others had left his office, Kerth prepared from the notes he had made a memorandum of the terms of the agreement which had been reached—tentatively according to appellants. This, he says, he immediately mailed to respondent Priest. The latter testified that he was unable to recall the precise date on which he received the memorandum, but was quite sure that it did not reach his office until after the foreclosure sale which occurred on March 19th, two days after the conference. Respondent after making some minor corrections signed the memorandum and mailed it to Smith. A week or more later Smith delivered the document, signed by himself, Cunliff and Priest, to Kerth at the latter's office. Looking over the document in Smith's presence, Kerth asked if there had not been a change made in it; Smith said that none had been made to his knowledge. Kerth thought he discovered that the paper of the second sheet was unlike that of the first, but without further comment retained the instrument. It remained in his possession until produced by him at the trial. The agreement evidenced by it corresponds in all respects to that testified to by respondent, Newbold and Smith. It was never signed by either of the Oehlers.

Respondent refrained from filing his proposed bill in equity for a judicial foreclosure of the deed of trust on the Crystal Lake Park property and the appointment of a receiver; neither he nor Cunliff or Smith was present at the trustee's sale which was had on March 19, 1927, pursuant to the published notice; at such sale there was no competitive bidding; appellants bought the property and with the passive acquiescence of respondent, Cunliff and Smith went into immediate possession. He also, without further consultation with the previous owners, took charge of and used the lumber on the premises, being the same lumber which had been the subject in part of the negotiations had in Kerth's office on March 17th. In this connection it should be said that Oehler claimed at the trial that a few days previous to the conference at Kerth's office he had entered into a verbal contract with Smith for the sale of the lumber, but he admitted that on the day of the conference Smith told him that if a settlement was reached he could have the lumber as a part of the consideration; and Kerth testified that the delivery of the lumber to Oehler was one of the terms of the contract tentatively agreed to.

Some two or three weeks after the foreclosure sale, Kerth sug· gested to respondent, Cunliff and Smith that instead of their executing to the Oehlers an indemnifying bond they pay in cash all items of costs growing out of the bankruptcy proceedings which were chargeable against the Crystal Lake Park property, and to this

they agreed. Such items were not, however, ascertainable at that time.

At the time of the conference the amount of the delinquent taxes against the property was not known; the statement was made by one of the parties present, and apparently acquiesced in by the others, that such amount could not be ascertained until the first of the following June. The amount of the attorney's fee covered by the stipulation was not then fixed, but left for adjustment by respondent and Kerth.

For a month or two there were desultory communications by phone and letter, or through office visits, between Kerth on the one side and respondent and Smith on the other in their efforts to ascertain or determine the respective amounts of the taxes, the bankruptcy items and the attorney's fee, and then conclude the settlement by their payment. Eventually the attorney's fee was tacitly, if not expressly, fixed at $2,000; the amount of the taxes was found to be $600; and that of the bankruptcy items, $1192. After these a-mounts had been definitely determined, the closing up of the settle-ment was further delayed through some difference that had arisen between Cunliff and Smith as to the proportion, as between them, each should pay. In the meantime respondent endeavored without avail on two occasions to have appellants accept his check for part of the unpaid items and give him an acquittance of further liability in respect to them. Finally, in the latter part of July or the first of August respondent offered to pay to Kerth for appellants the whole of the amounts above mentioned, and also the item of $2,000 for broken dishes and furniture, all other stipulations of the contract of settlement having been performed, but Kerth declined the offer, say-ing that his clients had instructed him to sue on the notes.

Following Kerth's statement that he had been directed to sue on the notes, this action was immediately commenced. It was brought by respondent as sole plaintiff; Crystal Beach, Inc., Cunliff and Smith, were joined with the Oehlers as parties defendant. The petition after setting forth certain matters by way of inducement, including the endorsement by plaintiff and defendants Cunliff and Smith of the first six of a series of notes executed by the Crystal Beach, Inc., to the Oehlers, alleged in substance that the liability of plaintiff, Cunliff and Smith as such endorsers had been fully discharged and extinguished through and by means of an oral contract entered into between the parties on March 17, 1927, the terms of which, as pleaded, have been set out in a preceding paragraph. It fur-ther alleged that said oral contract had been performed in part, the particulars of which were set out, that plaintiff had tendered per-formance of the unperformed stipulations, namely, the payment in full of the items of $2,000 for property damage, $2,000 for attorney's

fee, $1192 for bankruptcy costs and $600 for taxes; and that defendants Oehler had refused to accept such payments and were threatening to sue plaintiff as endorser on said notes. The petition further alleged that it was agreed that as between plaintiff and defendants Cunliff and Smith said defendants should be jointly liable for five-sixths and plaintiff one-sixth of the obligations assumed by them under said oral contract with the Oehlers. The prayer was that the Oehlers be permanently enjoined from instituting any action at law against plaintiff as endorser of said notes, and that upon payment by plaintiff of the remaining unpaid items due under said oral contract the Oehlers be required to deliver to him the six notes which had been endorsed by him, and, further that plaintiff have judgment against defendants Cunliff and Smith for contribution.

The separate answer of defendants Oehler was in effect a general denial, coupled with averments that there was no consideration for the alleged oral agreement and that plaintiff had an adequate remedy at law. Defendants Cunliff and Smith each answered with a general denial.

Following the hearing a decree was entered in favor of plaintiff, the provisions of which will be considered in the course of the opinion. Defendants Oehler prosecute this appeal from it.

Appellants seek a reversal of the judgment of the circuit court on the following grounds: (1) The petition does not state a cause of action of equitable cognizance; (2) the evidence wholly fails to establish the alleged oral contract; (3) the alleged contract, not having been fully performed on plaintiff's part, did not operate to extinguish his liability on the notes; (4) the alleged contract, if it exists, can be enforced only by a suit in which Priest, Cunliff and Smith join as plaintiffs; (5) plaintiff failed to make a proper tender of the amounts due under the alleged contract, or if he did, he failed to keep the tender alive.

I. Appellants contend that respondent's bill states no equity, because on its face it shows that he has an adequate remedy at law; that is, that the contract of settlement, which is made the basis of respondent's bill, could be pleaded in defense in an action at law upon any one of the notes.

It appears from the petition that at the time of its filing respondent was an endorser of six negotiable notes, only one of which had become due, the other maturing one each year for a period of five years thereafter. There was nothing to prevent the Oehlers from transferring the notes not due to an innocent purchaser for value, thereby cutting off respondent's defense to any action that might be brought on them. Or if they did not negotiate the notes, they might withhold them from suit for such length of time that the

evidence necessary to establish the oral contract entered into for their settlement and discharge would be unavailable.

"Whenever a deed or other instrument exists which may be vexatiously or injuriously used against a party after the evidence to impeach or invalidate it is lost, or which may throw a cloud or suspicion over his title or interest, and he cannot immediately protect or maintain his right by any course of proceedings at law, a court of equity will afford relief by directing the instrument to be delivered up and cancelled, or by making any other decree which justice and the rights of the parties may require." [Martin v. Graves, 5 Allen, 601, cited with approval in Hanson v. Neal, 215 Mo. 256, 280.]

"To deprive a court of equity of jurisdiction, the remedy at law must be so plain, complete and adequate that it attains the full end and justice of the case, reaching the whole mischief and securing the whole right of the party in a perfect manner, not only at the present time, but also in the future. In other words, it must be as perfect and adequate as would be the remedy in equity." [New York Life Ins. Co. v. Cobb, 219 Mo. App. 609, 619, and cases there cited.]

That respondent was entitled to invoke equitable relief is scarcely debatable.

II. The contention under this head is that no completed enforceable contract was concluded at Kerth's office on March 17th: "that only tentative propositions were discussed, which were to be incorporated into a written memorandum and submitted for approval and signatures."

"Where contracting parties agree to reduce their contract to writing, the question whether their negotiations constitute a present contract usually depends upon their intention, or, as it is sometimes expressed, upon whether they intend the writing to be a condition precedent to the taking effect of the contract." [6 R. C. L. 618, sec. 39.]

"The mere fact that the parties have expressly stipulated that there shall afterwards be a formal agreement prepared, embodying the terms which shall be signed by the parties, does not by itself show that they continue merely in negotiation. It is a matter to be taken into account in construing the evidence and determining whether the parties have really come to a final agreement or not. But as soon as the fact is established of the final mutual assent of the parties, so that those who draw up the formal agreement have not the power to vary the terms already settled, I think the contract is completed." [Rossiter v. Miller, 3 App. Cas. (Eng.) 1124, per Lord BLACKBURN.]

"Though the terms of the contract may all be agreed upon, still if the parties make it a condition to the existence of a contract that the terms agreed upon be reduced to writing and signed by

them, there is no contract until this is done. . . . On the other hand, it is well-settled law that, where the parties have assented to all the terms of the contract, the mere reference to a future contract in writing does not negative the existence of a present contract. In other words if the parties make an agreement which they intend shall be binding from the time it is made, effect will be given to it from that time, though they intend it shall be superseded by a more formal written agreement." [Green v. Cole, 103 Mo. 70, 76, 15 S. W. 317.]

With respect to whether the parties at the conclusion of the negotiations on March 17th considered that they had entered into a present contract, the direct evidence is conflicting. Priest, Smith and Newbold, acting for Cunliff, each testified in substance that on that occasion the several propositions constituting the subject-matter of the negotiations were discussed at length, that a tentative agreement as to each was reached during the discussion and immediately jotted down in writing, and that at the conclusion of the discussion Priest rehearsed · all of the matters so discussed and tentatively agreed to and then asked each of the parties, "Do you now agree to these things?" and received from each an unqualified affirmative answer. He then suggested that Kerth prepare a memorandum of the agreement and send it around for the signatures of the parties.

Both the Oehlers on the other hand testified very emphatically that Oehler reserved his final approval of the terms of the agreement until he could see them set down in writing. This was the one thing which they, at the time of the trial, could distinctly recall; practically everything else that had transpired at the conference on March 17th had faded from their memories. This taxes credulity somewhat.

There are, however, circumstances, including the acts of the the parties, more convincing than their testimony as to whether at the time they concluded their negotiations they considered that they had entered into a present contract and intended to be bound thereby. It should be first noted that every term of the contract, assuming it to be such, was assented to by each of the parties as it was reached during the progress of the negotiations. The evidence is without conflict at this point; the testimony of Kerth corroborates here that of Priest, Smith and Newbold. After the negotiations had been concluded there was no haste about the preparation and signing of the memorandum, although the advertised foreclosure sale was but two days away. All parties treated the negotiations as a finality; respondent did not file his bill in equity for the appointment of a receiver and a judicial foreclosure; neither he nor his co-endorsers on the notes attended the deed of trust sale or in any manner interfered with the Oehlers acquiring thereat title to the mortgaged

premises and subsequently entering into the possession. Oehler on his part upon taking possession appropriated to his own use the lumber found there as, under the terms of the contract, he had a right to do; and his attorney continued thereafter in his efforts to ascertain and determine the amounts payable to Priest, Cunliff and Smith, under the terms of the contract, including an attorney's fee for himself. A week or more after the foreclosure sale the contract at Kerth's solicitation was modified by a stipulation that respondent and his co-obligators should pay the bankruptcy items in cash instead of giving a bond to indemnify the Oehlers against loss by reason of them. Subsequently Kerth ascertained and reported to respondent the amount of those items with the request that he pay it. In fact there was no hint or intimation on the part of either of the appellants or their attorney that they did not regard the negotiations had on March 17th as constituting a contract, until about the first of the following August when the first of the endorsed notes was about to mature.

In view of all the facts and circumstances disclosed by the evidence, including the conduct of the parties, we conclude that they did not intend that the preparation and signing of a memorandum be a condition precedent to the taking effect of the contract; but that the stipulated memorandum was intended rather as a convenient memorial or record of the contract. This conclusion finds additional support in the fact that a number of the terms of the contract could not presently be performed by respondent and his co-obligators, the amounts of the payments called for by them not being ascertainable.

We are also of the opinion that appellants are precluded, on grounds of estoppel, from denying that the negotiations of March 17th constituted a completed contract. It has been held that if the terms of a contract which is to be reduced to writing, but never is, are agreed on, parties receiving benefits under it will not be heard to say that the understanding that it was to be reduced to writing was not carried out, for the purpose of avoiding the obligations placed on them by it. [Miller v. McManis, 57 Ill. 127. See, also, Riggins v. Railroad, 73 Mo. 598; Paige v. Woolen Co., 27 Vt. 485.]

III. Appellants next contend that, even if it be conceded that the parties entered into the oral contract alleged in the petition, such contract did not operate as an accord and satisfaction as to respondent's liability on the notes because it was not fully performed. An accord and satisfaction was not pleaded. The petition proceeds on the hypothesis of a substituted contract. It is not always necessary, however, that an ac-

cord be executed. The acceptance of a new and valid promise which can be enforced, in substitution of an existing claim, may be as effectual a satisfaction and extinguishment of such claim as the acceptance of any other thing. [Goodrich v. Stanley, 24 Conn. 613.] The evidence clearly shows that it was the understanding of all the parties that the new obligations assumed by Priest, Cunliff and Smith under the oral contract should supplant their liability as endorsers of the notes. It is immaterial therefore whether the contract be called an accord and satisfaction, a novation or merely a substituted contract; it was sufficient to extinguish the liability on the notes whether performed or not. [Carman v. Harrah, 182 Mo. App. 365, 170 S. W. 388; Worden v. Huston, 92 Mo. App. 371; Bandman v. Finn, 185 N. Y. 508, 78 N. E. 175.]

Under this head appellants invoke the rule that one joint obligee, without the concurrence of his co-obligees, cannot maintain an action upon a joint contract. [Clark v. Cable, 21 Mo. 223.] The rule is applicable only in actions at law. In addition to the fact that this is a suit in equity, the obligation of the contract running to plaintiff and defendants Cunliff and Smith is as to them several as well as joint, each has a several right to have it enforced. The point made as to non-joinder of parties plaintiff is without substance.

V. Before bringing the suit respondent offered to pay appellants all the unpaid items due them under the contract, but he. made no actual tender of the amounts. It is not essential to the maintenance of this action that he should have made a tender. In equity the rule is, if the bill contains a general offer to do equity in conformity to the decree of the chancellor, that will suffice without making an actual tender. This because it is always within the power of a court of equity, where its decree is invoked, to require, as "the price of its decree," that the person invoking it shall submit to equitable terms, and accordingly a chancellor always inquires concerning the equities which the plaintiff must do, in order that he may be entitled to the relief which he seeks. [Peak v. Peak, 228 Mo. 536, 128 S. W. 981.]

In his bill respondent asked "that the court decree upon plaintiff's paying all the items due under said contract of March 17, 1927, to John G. Oehler and Jessie B. P. Oehler and John G. Oehler and Jessie B. P. Oehler deliver to plaintiff all of said notes, etc." The decree rendered provided: "that they [the Oehlers] surrender and deliver to George T. Priest, Nelson Cunliff and William H. Smith the aforesaid promissory notes; that George T. Priest, William H. Smith and Nelson

604

Cunliff be commanded and directed to pay the said John G. Oehler and Jessie B. P. Oehler the sum of $2600.''

It is conceded that the following amounts are due and owing appellants under the contract of March 17th: $2,000 for property damage; $600 for taxes; $1192 to cover the bankruptcy items; and $2,000 as a fee for their attorney. Yet the court only required respondent to pay appellants $2600. In this respect the decree is clearly erroneous.

The decree is anomalous in another respect: it grants respondent the relief he seeks and then commands him to make payment to  appellants. It should have made his bringing into court for the use of appellants the moneys due them under the contract a condition precedent to the granting of the relief: that is "the price of its decree" which should have been required.

The judgment of circuit court is reversed and the cause remanded with directions to that court to enter a decree in favor of respondent in accordance with the views herein expressed. All concur.