This is a suit in equity to enjoin a foreclosure sale under a deed of trust. The suit was brought by the Shapleigh Investment Company, the owner of the property, against The Columbian National Life Insurance *Page 933 
Company, the owner of the deed of trust, and Franklin Miller, the successor trustee under the deed of trust. In the trial court, plaintiff prevailed. Defendants appealed.
The deed of trust in question, which covered a lot located at the northeast corner of Nineteenth street and Washington avenue in the city of St. Louis, was executed on January 2, 1926, by William E. Beckermann, a straw party for the then owners of the property, and secured by a principal note in the sum of $50,000, payable in three years. At the end of the three years, the note was extended so as to become due January 2, 1932. In 1932, plaintiff acquired this land subject to the deed of trust, and has ever since owned it. Early in January, 1932, negotiations between the parties for an extension of the loan were carried on by correspondence, and an agreement was finally reached whereby $1,000 was paid on the principal, and the note extended for three years, with interest at 5½%, payable semi-annually, evidenced by interest notes. It was also agreed that $1,000 would be paid on the principal at the end of 12 months, and $1,000 every six months thereafter during the extension period. A formal renewal agreement was drawn up and signed by Shapleigh Investment Co. It set out the terms of the renewal agreement, and provided that:
"If there shall be any default in the payment of any portion of said principal note or notes as extended, or of any of said renewal interest notes at maturity, or in the due performance of the covenants and obligations undertaken in said deed of trust, then this agreement shall be voidable, and the legal holder of said principal note or notes may, at his option, proceed to enforce payment thereof under the provisions of said deed of trust the same as if this extension had not been made. This extension is made at the request of, and its terms agreed to by the undersigned present owners of the property described in said deed of trust, who do hereby guarantee unconditionally the payment of said principal note or notes and the renewal interest notes above described."
In December, 1934, the parties again by correspondence entered into negotiations for the renewal of the loan, and it was finally agreed to extend the loan for one year upon the payment of $1,000 on the principal, the execution of two interest notes, and two principal notes of $1,000 each, maturing July 2, 1935, and January 2, 1936, which when paid would reduce the balance of the principal due from $44,000 to $42,000. No formal renewal agreement was signed, but on the principal note the following endorsement was made:
"January 2, 1935
"The within note of Wm. E. Beckermann, originally in the sum of $50,000, has been reduced by previous payments hereby acknowledged to the sum of $44,000.00, which said balance is hereby extended for the period of one (1) year, provided two semi-annual sums of $1,000.00 each are paid on account of the principal and two semi-annual interest notes of $1100.00 and $1075.00 respectively, due July 2nd, 1935, and January 2nd, 1936 are promptly paid at maturity."
When the loan came due in January, 1936, the parties again entered into negotiations for a renewal, but the record does not show any agreement as of that time. In fact, an examination of the record shows that the next agreement for renewal was reached in 1941. That agreement was reached by correspondence between the parties. No formal instrument embracing the terms of the agreement and signed by the parties was executed, but the following memorandum was attached to the note:
"May 2, 1941
"The balance of $42,000.00 due on this note hereby extended for 3 years from May 2nd, 1941, provided further payments of $250.00 each are made on November 2nd, 1941, May 2nd, 1942, November 2nd, 1942, May 2nd, 1943 and November 2nd, 1943, so that at maturity the loan will have been reduced to the sum of $40,750.00, provided also interest is paid at the rate of 3½% per annum on the principal amount due on November 2nd, 1941, and semi-annually thereafter; if such payments of interest and principal are not made promptly this extension is null and void."
Beginning March 31, 1944, correspondence between the parties was had, looking toward a further renewal of this loan. The correspondence was between Mr. J.H. Farish, agent of the plaintiff, and Mr. Carl C. Mullen, vice-president of the defendant company, and also Mr. Francis P. Sears, president of the defendant company, who answered some of Mr. Farish's letters in the absence of Mr. Mullen. *Page 934 
This correspondence was initiated by Mr. Farish in his letter of March 31, 1944, to Mr. Sears, in which he said:
"If The Columbian National is willing to carry on on the same basis — accept $250.00 on account of the principal May 2nd, 1944 and renew the loan with a payment of $250.00 every six months, plus the interest, with prompt payment of the general taxes, I believe that I can persuade the present owner to agree to the arrangement. * * * I am suggesting that you renew the loan on the same terms as you did three years ago."
To this letter a reply, dared April 4, 1944, was received from Mr. Mullen, stating:
"We are willing to renew the mortgage on the same basis — $250 to be paid on account of the principal at the present maturity date, May 2, 1944, and the balance extended three years with currniments of principal of $250.00 on interest dates, semi-annually.
"We all think the interest rate of 3½ per cent is too low and suggest you use your best efforts to get the rate up at least one-quarter of one per cent.
"Upon receipt of your advice we will notify our attorney to draw up the necessary extension agreement."
On the same day, Mr. Mullen wrote to Mr. Jones, plaintiff's attorney the following letter:
"We have agreed to renew the Shapleigh Investment Company mortgage secured by property at the northeast corner of 19th and Washington Streets, and in that connection we wish you to draw up the necessary extension agreements. We have agreed to this extension as a result of a letter from Mr. Farish, and as I distinctly recall that we checked up pretty carefully on the Shapleigh Investment Company to ascertain if they were responsible or not, it seems imperative that in executing this new extension agreement that both the Shapleigh Investment Company and Mr. Shapleigh, Individually, go on the agreement.
"There is a little difference of opinion relative to the terms of the extension, but as soon as I hear definitely from Mr. Farish I will let you know the terms and ask you to go ahead with drawing up the necessary papers."
On April 10, 1944, Mr. Farish replied to Mr. Mullen's letter of April 4, 1944, as follows:
"I think under the circumstances it would be a mistake to try to increase the rate of interest, and that it is very much better for The Columbian National to continue the present arrangement, namely: to pay $250.00 every six months on the principal and secure continuous interest and the prompt payment of taxes. If the war is brought to a successful issue within the next year or so it is very likely that I may be able to take the whole loan up so that the small increase in interest which might jeopardize the extension will amount to very little in point of dollars.
"I am waiting for your reply, but suggest no change be made in the present arrangement. There is no question of course that the interest rate of 3½% is low, but the purpose of the reduction was to indnce the equity owner to carry on; do you not think it is good business not to disturb the present arrangement?"
To this letter Mr. Mullen, under date of April 12, 1944, replied:
"In view of your letter of April 10, we will extend the Shapleigh Investment Company mortgage at 3½ per cent interest payable semi-annually; the principal to be reduced by $250,00 at the present maturity date of May 2, 1944 and the balance extended for three years with curtailments of principal of $250.00 on interest dates.
"We are accordingly instructing Mr. Jones to draw up the necessary extension agreement to put this in force, and he will get in touch with you relative to having the extension agreement signed by the proper parties."
On the same date Mr. Mullen again wrote to Mr. Jones as follows:
"In connection with our Shapleigh Investment Company mortgage secured by property at the corner of 19th and Washington Streets, we have agreed to extend this mortgage as follows:
"$250 to be paid on account of the principal at the present maturity date of May 2, 1944, and the balance extended for three years with interest at 3½ per cent per annum payable semi-annually and with curtailment of principal of $250 on interest dates.
"Will you kindly draw up the necessary extension agreement to put this extension into effect and have Mr. Farish secure the required signatures. I think you understand the situation with reference to the advisability of having Mr. Shapleigh sign *Page 935 
this extension. Will you therefore fully protect our interest in this matter."
An attempt was made to get Mr. Shapleigh to become a party to an extension agreement, but he advised Mr. Jones that he would not sign any extension agreement upon which he would be personally liable. Mr. Mullen then wrote to Mr. Farish under date of April 26, 1944, as follows:
"In connection with the extension of the Shapleigh Investment Company mortgage, we instructed Calhoun Jones to draw up the necessary extension papers and secure the proper signatures thereon.
"He has just wired us that Mr. Shapleigh refuses to execute the note and deed. From Mr. Jones' wire, it is not clear whether Mr. Shapleigh refuses to sign individually or as president of the Shapleigh Investment Company.
"Realizing your feeling that the property is not worth more than the mortgage, our position is not any too sound in insisting upon Mr. Shapleigh's individual signature on the extension papers.
"What would you advise under the circumstances?"
On April 27, 1944, Mr. Farish wrote to Mr. Sears, defendant's president, as follows:
"The present owner of the property is willing to carry on, paying $250,00 on the principal and semi-annual interest of $713.12 (taxes for 1943 have been paid), but this owner will not assume personal responsibility for the principal of the debt.
"I am advising you to authorize the renewal of the extension agreement as suggested, otherwise The Columbian National may run the risk of taking over the property when there is no necessary therefor.
"We are also willing to cancel the present deed of trust and execute a new instrument securing principal note of $40,500.00 with semi-annual payments of $250.00. Will you suggest to Mr. Mullen that the Company prefers to carry on, since I feel that this loan will ultimately be paid off in full without loss of interest or principal."
Under date of April 28, 1944, Mr. Farish answered Mr. Mullen's letter of April 26th, as follows:
"Am certainly advising your Company to extend your mortgage #1669 without insisting on a contract for the Shapleigh Investment Company, since you will immediately receive the sum of $962.12, and it is almost an assured fact that the owners of the property will continue to make semi-annual payments of $250.00, with the prompt interest payments and prompt payment of general taxes."
Under date of May 1, 1944, Mr. Sears wrote to Mr. Farish as follows:
"I am replying to your letter of April 27, 1944 because Mr. Mullen has gone off for a weeks vacation on his regular annual salmon fishing trip in New Brunswick.
"I hoped we could get Mr. Shapleigh to sign the extension since I understand he is the real owner of the property, but if he refuses to do so, I suppose we shall have to go on as suggested in your letter of March 31, 1944 — that is to say $250 to be paid on account of principal on May 2, 1944, and the payment of the loan $40,500 to be extended three years with the payment of $250 on account of principal every six months plus interest at 3½% plus payment at this time of a special tax bill of $1,000 and agreement as to prompt payment of general taxes."
In answer to the above letter Mr. Farish wrote to Mr. Sears on May 4, 1944, as follows:
"I am agreeing with you that The Columbian National's best interest is preserved through an extension of the loan, as suggested in previous letters. You will, of course, remember that Mr. Shapleigh had nothing to do with the original loan, and naturally refuses to be responsible for its ultimate payment; but I am under the impression there may be a revival of values in this neighborhood, and as long as taxes and interest are being paid and an annual reduction, The Columbian National is that much better off.
"Am enclosing check for $963.12 of which $713.12 covers interest to May 2nd, 1944 and $250.00 on account of the principal, thereby reducing the principal to $40,500.00. It is understood that $250.00 will be paid every six months, plus interest at 3½%, and that the general taxes will be promptly paid as and when due. Kindly acknowledge receipt of check."
Mr. Mullen, in a letter dated May 9, 1944, acknowledged receipt of the check which had been sent to him in Mr. Farish's previous letter, and enclosed the company's receipt for same.
 On May 18, 1944, Mr. Farish wrote Mr. Mullen as follows: *Page 936 
"It would appear from our correspondence that your Company prefers a contract of extension as to the $40,500.00 loan, and since the legal life of the original deed of trust may expire, McCunc Gill, Vice President of the Title Insurance Corporation, suggests an extension executed by the owner of the property and the holder of the loan; this contract renews the life of the deed of trust, and does not set up any personal liability. Our client wants to avoid this liability, but also wants the Insurance Company protected as to its right of foreclosure.
"Personally I believe we shall carry on and that some day we may improve the corner, first paying off the loan. Meanwhile, if mutually agreeable, return contract and we will have same executed."
The proposed renewal agreement, which was enclosed in this letter, by its terms extended the loan to May 2, 1947, with interest at the rate of 3½% per annum, payable semi-annually, and provided for the payment of $250 semi-annually on the principal, and stipulated for the payment of general state and city taxes. It also contained the following provision:
"And it is further agreed that the holder of said note will look solely to said property and its income for payment and will not attempt to collect any deficiency from the Shapleigh Investment Company."
On May 25, 1944, Mr. Mullen wrote to Mr. Farish, acknowledging receipt of his letter of May 18th, and stating that his company could not accept the form submitted because of the paragraph relieving Shapleigh Investment Company from liability. The letter then refers to the attempt to secure Mr. Shapleigh's signature to an extension agreement, and states that the company assumed that Mr. Shapleigh's refusal referred to his personal signature, and that the company "would not attempt to hold him individually, only the Shapleigh Investment Company." The letter concludes by stating that although Mr. Shapleigh had nothing to do with the original loan, the Shapleigh Investment Company had negotiated for renewals, and that "We therefore cannot under any circumstances agree to the renewal of the deed of trust which you submitted unless the last paragraph thereof be deleted and further that the form of renewal be approved by our attorney, Mr. Jones. Unless our request is complied with forthwith, we shall be forced to take legal action to protect our Company's interest."
This letter was followed by some correspondence between counsel for both sides, which was not introduced in evidence. In October, 1944, Mr. Mullen was in St. Louis, and negotiations took place with a view to adjusting the matter, but nothing seems to have come of it. On October 11, 1944, Mr. Farish sent the insurance company a check for the principal and interest that was to become due under the extension agreement on November 2nd. The insurance company accepted the interest, but, on advice of counsel, refused to accept the principal. Later, however, said principal payment was accepted by the insurance company pursuant to a stipulation that its doing so would be without prejudice.
On October 23, 1944, the defendant trustee began foreclosure proceedings upon request of defendant company. Thereupon plaintiff filed this suit seeking to enjoin defendants from proceeding with the foreclosure. A temporary injunction was issued; and, on final hearing, it was made permanent.
The trial court found that the parties had by their letters, dated May 1st (Sears to Farish), May 4th (Farish to Sears), and May 9th (Mullen to Farish), reached an agreement to extend the loan for three years on the terms stated in said letters.
In this court, appellant contends that no contract between the parties resulted from this correspondence because one of the terms of the proposed extension, namely, liability of the owner, remained unsettled To this we cannot agree.
After considerable negotiations between the parties, Mr. Sears, representing the appellant, wrote to Mr. Farish, respondent's agent, on May 1, 1944, proposing to renew the loan for three years, at 3½% interest, upon payment of $250 on the principal on May 2, 1944, and a like sum thereafter every six months, and the payment of taxes on the property. In reply to this letter Mr. Farish forwarded a check for $963.12, which covered the interest due to May 2, 1944, and the first payment due under the alleged renewal agreement, and stated: "It is understood that $250.00 will be paid every six months, plus interest at 3½%, and that the general taxes will be promptly paid as and when due." Mr. Mullen, in a letter dated May 9, 1944, acknowledged receipt of the check and enclosed the appellant's receipt for same. *Page 937 
When the parties agreed to an extension of the loan, they by that act agreed that the existing liability for the debt on the part of respondent would be continued, Columbian National Life Insurance Co. v. Dubinsky, 349 Mo. 299, 160 S.W.2d 727.
Appellant further contends that there was no binding contract because the parties intended that before they should be bound, the terms agreed upon should be reduced to writing and signed by them.
Where parties negotiate an agreement and clearly express an intention not to be bound until a formal contract is executed, such intention must be respected. But, where the parties fail to state that their negotiations are to be regarded as merely contingent upon the final execution of a written agreement, the question of whether they intended to be bound by anything less than such a contract is sometimes a rather difficult question. It is resolved by ascertaining whether the parties actually looked upon the formal writing merely as evidence of their preliminary agreement, or as an operative fact without which they intended not to be bound. Geary v. Great Atlantic Pacific Tea Co.,366 Ill. 625, 10 N.E.2d 350; Mississippi Dominion Steamship Co. v. Swift, 86 Me. 248, 29 A. 1063, 41 Am.St.Rep. 545; Atlantic Terra Cotta Co. v. Chesapeake Terra Cotta Co., 96 Conn. SS, 113 A. 156. The mere fact that the parties contemplate a formal written draft of their agreement is not sufficient in itself. Priest v. Ochler,328 Mo. 590, 41 S.W.2d 783. Such expressions in correspondence as "mailing contract" or "please forward contract," or an acceptance "subject to drawing contract" or "pending issuance of formal contract," have been hold not to destroy the binding effect of the preliminary agreements. Priest v. Ochler, 328 Mo. 590,41 S.W.2d 783; Vantrees v. Trimble, 214 Mo.App. 30, 251 S.W. 396; Sanders v. Pottlitzer Bros. Fruit Co., 144 N.Y. 209, 39 N.E. 75, 29 L.R.A. 431, 43 Am.St.Rep. 757; American Smelting Refining Co. v. United States, 259 U.S. 75, 42 S.Ct. 420, 66 L.Ed. 833; United States v. Purcell Envelope Co., 249 U.S. 313,39 S.Ct. 300, 63 L.Ed. 620; Bolton Partners v. Lambert, 41 Ch.Div. 295. In addition, it must appear that the parties intended not to be bound until such a writing was signed. Priest v. Ochler,328 Mo. 590, 41 S.W.2d 783; Green v. Cole, 103 Mo. 70, 15 S.W. 317; Riggins v. Missouri River, Fort Scott Gulf R. Co., 73 Mo. 598; Washington Dehydrated Food Co. v. Triton Co., 151 Wash. 613,276 P. 562.
In the case at bar, although the parties did contemplate a formal writing, they did not expressly stipulate that they would not be bound until such instrument was executed. Therefore, it becomes a question of fact as to whether the parties intended the formal writing to be merely a memorial of their agreement arrived at through their correspondence, or whether they intended that there should be no contract until the execution of the formal extension agreement.
We do not believe that either party in this case intended to postpone the effective date of the contract until a formal extension agreement was prepared and signed. We reach this conclusion after considering not only the correspondence, but also the prior dealings between the parties, and the practical interpretation apparently put upon the transaction by the parties themselves. The loan had been extended several times, in previous years, without the execution of a formal document. The record also shows that the parties entered into the performance of their agreement without either party insisting that a signed agreement was necessary.
It is true that in his letters appellant's agent speaks of instructing his attorney "to draw up the necessary extension papers," but this is not decisive of the matter. It is merely a circumstance to be considered along with all the other evidence in the case which tends to throw light upon the intention of the parties. Bolton Partners v. Lambert, 41 Ch.Div. 295; Vantrees v. Trimble, 214 Mo.App. 30, 251 S.W. 396.
We find that the parties through their correspondence reached an agreement sufficiently definite and clear in its terms to make a binding contract, and that they regarded the formal writing which they contemplated preparing merely as a memorial of their preliminary agreement, and not as necessary to the consummation of the contract.
Plaintiff's promise to pay interest for three years, and its relinquishment of the right to pay the entire principal before the extended maturity, constituted sufficient consideration for the extension agreement. Feldmann v. Riegel, Mo.App.,39 S.W.2d 452; Baade v. Cramer, 278 Mo. 516, *Page 938 213 S.W. 121; Stillwell v. Aaron, 69 Mo. 539, 33 Am.Rep. 517; Russell v. Wyant,214 Mo.App. 377, 253 S.W. 790.
Appellant further contends that respondent should be denied relief because it tried to secure a renewal agreement which would have relieved it of the guaranty of payment which it had executed in 1932. Appellant's theory in this respect is that by said conduct respondent does not come into court with clean hands. We find no merit to this contention. Respondent did nothing that was legally or morally wrong, and it has at all times since been ready and willing to comply with the terms of the agreement made.
Nor is it our opinion that as a price for relief respondent should be compelled to execute a formal written extension agreement. The rights of the parties would be no better preserved by such a document, nor their rights and obligations more clearly defined, than appears from their correspondence.
The judgment of the trial court is affirmed.
HUGHES, P.J., and McCULLEN, J., concur.
 *Page 135