# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-2636
_____

LoRoad, LLC

*Plaintiff - Appellant*

v.

Global Expedition Vehicles, LLC

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Springfield

_____

Submitted: February 11, 2015
Filed: June 1, 2015

_____

Before LOKEN, SMITH, and COLLOTON, Circuit Judges.

_____

LOKEN, Circuit Judge.

LoRoad, L.L.C., based in Oregon, negotiated to have Global Expedition Vehicles, L.L.C. (GXV), based in Missouri, build a custom expedition vehicle. With the project underway, the relationship broke down. LoRoad filed this diversity action to compel arbitration of the dispute, invoking the arbitration provision in a written Assembly Agreement allegedly entered into by the parties. GXV denied a valid, enforceable agreement to arbitrate. Ruling on cross-motions for summary judgment,

the district court[1] held that LoRoad failed to accept the Assembly Agreement signed by GXV; therefore, the court could not enforce the arbitration provision in that Agreement. LoRoad appeals the resulting adverse summary judgment. We affirm.

## I.

In September 2012, wilderness photographer Rodney Lough on behalf of LoRoad began negotiations with GXV for construction of a custom expedition vehicle to be used by LoRoad for Lough's off-road photography expeditions. On October 1, GXV sent a proposed Assembly Agreement for Lough's review. The Agreement contained terms sufficiently definite and complete that, had LoRoad accepted, it would have been a binding contract. The terms included a "nonrefundable deposit of $120,000 to be paid at contract signing," and an arbitration clause. GXV also emailed Lough that it would purchase a 2001 BAE 6x6 truck for $110,000 to serve as the base for Lough's custom vehicle. Each subsequent version of the Assembly Agreement included this specific truck in calculating the total cost to build.

Rather than accept the October 1 proposed Agreement, Lough returned a marked-up copy on October 9. GXV sent a revised Agreement on October 22, and after further negotiations, another revised Agreement on October 31. On November 2, LoRoad wired $120,000 to GXV, which René Van Pelt of GXV acknowledged on November 5. On November 16, Lough faxed GXV the October 31 draft Agreement with relatively minor handwritten notations and changes. In the space for LoRoad's signature at the end of the Agreement, Lough wrote "LeeAnna Lough" (his wife and also a LoRoad principal) above the LoRoad signature line, and "By:" below that line.

---

[1]The Honorable Sarah W. Hays, United States Magistrate Judge for the Western District of Missouri.

On November 28, Lough emailed, "We still have unfinished business." Van Pelt responded with answers to "notes and questions that we received by fax on November 16th." On December 6, GXV sent a receipt for the $120,000 with the subject line, "Contract Deposit," and emailed a status report on acquiring the base vehicle. On December 11, after further communications, Van Pelt sent LoRoad a revised Build List, which was "Exhibit A" to the Assembly Agreement and listed specifications for the vehicle. Van Pelt noted, "Once I get a thumbs up on the Build List, I will revise the contract and email to you as a complete document set." On December 15, Lough emailed Van Pelt, "I am still not feeling comfortable with how things are at the moment . . . We are very seriously looking at pulling out, at which point will [] want our money returned."

On January 30, 2013, Van Pelt emailed Rodney Lough, "Your BAE 6x6 in transit," explaining GXV's delay in getting the truck and predicting it would arrive at GXV on Friday. On Friday, February 1, Van Pelt emailed Lough a picture of the truck. On February 11, Lough emailed Van Pelt asking for a status report. Van Pelt responded that GXV's engineering team had started work on the truck, would send it to be painted when they were done, and asked Lough to "respond via email that the color is staying per Build List: White."

The next documentary exchange frames the contract issue on appeal. On February 11, Lough emailed Van Pelt saying LoRoad "had no record of the parties' creating and executing a final set of documents." Lough asked GXV to send "a final set [of documents] incorporating everything we've come to agreement on" "for final review and then signatures, so we can get this thing moving." Van Pelt responded that GXV received a signed contract from LoRoad on November 16.[2] Lough replied he had no record of that, and asked Van Pelt to "send me a copy of what you have,

---

[2]GXV interpreted the handwritten "LeeAnna Lough" on the marked-up Agreement LoRoad sent on November 16 as an authorized LoRoad signature.

-3-

because we do not have one here nor do we have an executed copy from you either." In response, Van Pelt returned a copy of the Agreement received from LoRoad on November 16, with Lough's handwritten changes and with the addition of Michael Van Pelt's signature on the GXV signature line, but without the critical Build List.

In a February 14 reply, Lough asked for the entire Agreement, stated he did not know where the document came from, and asserted, "That is NOT LeeAnna's signature . . . I would never have authorized LeeAnna to sign a document that was not ready for signature and this document isn't there and therefore we would not have signed it. I have emails from you going through and into December where the two of us continue finalizing the documents as they have not been completed." Lough further stated, "We do want you guys to create this vehicle however we are no where near having the documents done . . . and while you have our commitment in the form of a $120k deposit, that in no way means that you have an agreement with us until the final documents are signed, sealed and delivered properly."

On February 22, Van Pelt sent a document titled "Assembly Agreement Addendum" dated February 2013, and a Build List dated December 11, 2012 (neither document is in the record on appeal). Lough responded: "Sending us an Addendum for a non-executed Assembly Agreement is not what you said you would do." Lough "officially disputed your assertion that the Assembly Agreement is a signed and executed document." On February 25, Lough reiterated LoRoad had not executed an agreement and described the $120,000 as a "good faith deposit," not a payment under the Assembly Agreement. GXV then ceased work on the custom vehicle.

In March, LoRoad's attorney began communicating with GXV. His first letter stated, "Lo Road is committed to purchasing the Expedition Vehicle" but "there is no final, executed contract in place." The letter stated that, "according to all drafts of the Assembly Agreement, signed or not, GXV's commencement of work was to begin 15 days after receipt of the deposit," expressed concern about the delays, and asked for

-4-

certain action items to be completed, including a revised Build List. An attachment detailed eleven reasons why there was "No Executed Contract in Place."

On March 15, LoRoad's attorney sent another letter, invoking the Adequate Assurances provision of the Uniform Commercial Code. GXV responded on March 16, "Global Expedition Vehicles contends that we do have an executed contract with the Lo Road, LLC. We have expended a great deal of money and engineering payroll, based on this contract." Van Pelt sent an email on March 27 expressing surprise that Lough wanted to change the Build List because Lough advised on February 22 he wanted to proceed with the December 11, 2012 Build List. On April 19, LoRoad's attorney sent a letter stating that GXV had failed to provide adequate assurances and was in material breach of the contract, and that LoRoad intended to institute arbitration pursuant to the Assembly Agreement. This petition to compel arbitration followed.

## II.

LoRoad argues that the terms of the Assembly Agreement that GXV signed and faxed to LoRoad on February 13, 2013, included an agreement to arbitrate that is enforceable against GXV. If enforceable, the Assembly Agreement is "a contract evidencing a transaction involving commerce" subject to the Federal Arbitration Act, 9 U.S.C. § 2. However, the parties agree that Missouri contract law governs the issue on appeal. Under both the Federal Arbitration Act and Missouri law, "[a] party who has not agreed to arbitrate a dispute cannot be forced to do so. Accordingly, the court must determine whether there is an agreement between those parties which commits the subject matter of the dispute to arbitration." PCS Nitrogen Fertilizer, L.P. v. Christy Refractories, L.L.C., 225 F.3d 974, 977-78 (8th Cir. 2000) (quotations omitted); see Arrowhead Contracting, Inc. v. M.H. Wash., LLC, 243 S.W.3d 532, 535 (Mo. App. 2008). The party seeking to compel arbitration has the burden to prove a

valid and enforceable arbitration agreement. <u>Baier v. Darden Restaurants</u>, 420 S.W.3d 733, 737 (Mo. App. 2014).

As the Assembly Agreement concerned the sale of "goods," it is governed by Article 2 of Missouri's Uniform Commercial Code. <u>See</u> Mo. Rev. Stat. § 400.2-105(1). General principles of contract law apply unless "displaced by the particular provisions" of the UCC. Mo. Rev. Stat. § 400.1-103. Under the UCC, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Mo. Rev. Stat. § 400.2-204(1). Without question, the writing on which LoRoad relies was sufficiently definite to form a contract enforceable against GXV, including its arbitration provision. <u>See</u> Mo. Rev. Stat. § 400.2-201(1). But a writing alone is insufficient if it does not establish that an agreement was reached between the parties; the document must "indicate the consummation of a contract, not mere negotiations." <u>Howard Constr. Co. v. Jeff-Cole Quarries, Inc.</u>, 669 S.W.2d 221, 227 (Mo. App. 1983). Therefore, LoRoad must show an *agreement* between the parties. The district court concluded that the undisputed facts establish that LoRoad never accepted the Assembly Agreement. We agree.

The UCC "expands the traditional concept of a contract," but it "continues the common-law principle that the intent of the parties to make a contract must be manifested." <u>Computer Network, Ltd. v. Purcell Tire & Rubber Co.</u>, 747 S.W.2d 669, 674 (Mo. App. 1988). Thus, the "core issue" is whether both LoRoad and GXV intended to form a legally binding contract:

> If the parties intended no binding agreement or contract, the rules of construction and interpretation will not establish one. If no intent is found, the inquiry is put to an end. If the expressions in the agreement are clear, the court determines the intent from a reading of the writing. If the intent is not clearly expressed, then surrounding circumstances

may be considered -- *the subsequent actions of the parties* and the practical construction of the contract.

Id. (emphasis added). The intent which we are concerned with is the parties' objective intent and what a reasonably prudent person would have been led to believe from the actions or words of the parties. See id. at 675.

Here, if an authorized representative had signed the Assembly Agreement that LoRoad faxed to GXV on November 16, 2012, then the document was an offer,[3] and both sides manifested the intent to form a binding contract when GXV signed that document and returned it to LoRoad on February 13, 2013. This was GXV's contemporaneous interpretation of the effect of its action on February 13. But LoRoad immediately objected and countered with strong, indeed persuasive reasons why the marked-up document it faxed on November 16 was not a binding offer that GXV could accept, pointing out it was not LeeAnna Lough's signature on the document, and she was not authorized to sign a contract binding LoRoad . Thus, this document did not clearly manifest LoRoad's intent to form a binding contract. Rather, it appears to be merely another mark-up of an Assembly Agreement that GXV had initially proposed and which the parties had been negotiating for over a month. See FutureFuel Chem. Co. v. Lonza, Inc., 756 F.3d 641, 647 (8th Cir. 2014) ("ongoing negotiations between the parties over these terms demonstrates that there was no mutual assent").

Looking beyond the contract document on which LoRoad relies, the undisputed facts establish clear, immediate, unequivocal *rejection* by LoRoad and its attorney

---

[3] An offer is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." See Brown Mach., Div. of John Brown, Inc. v. Hercules, Inc., 770 S.W.2d 416, 419 (Mo. App. 1989), citing Restatement (Second) of Contracts § 24 (1981).

when GXV claimed in February 2013 that a binding contract had been formed. While such subsequent action would not revoke or nullify a contract already formed, it is relevant in resolving the ambiguity as to whether LoRoad intended to be bound to the terms of the marked-up form of contract it sent to GXV on November 16. This is precisely the analysis that this court and Missouri courts have conducted in resolving disputes over whether ongoing negotiations that included the exchange of multiple draft agreements resulted in a binding contract. See Arrowhead, 243 S.W.3d at 535-36 (no contract to arbitrate formed); Computer Network, 747 S.W.2d at 675 (contract formed); Howard, 669 S.W.2d at 228-29 (no contract); Shapleigh Inv. Co. v. Miller, 193 S.W.2d 931, 937 (Mo. App. 1946) (contract formed); FutureFuel, 756 F.3d at 647 (no contract); Conolly v. Clark, 457 F.3d 872, 876 (8th Cir. 2006) (e-mail correspondence following alleged hand-shake agreement showed continuing negotiations); Moses.com Securities, Inc. v. Comp. Software Sys., Inc., 263 F.3d 783, 784 (8th Cir. 2001) (no contract).

LoRoad further argues that the requisite intent to form a binding Assembly Agreement was proved by "conduct by both parties which recognize[d] the existence of such a contract." Mo. Rev. Stat. § 400.2-204(1); see § 400.2-207(3). We agree GXV's conduct was consistent with recognition of a binding contract. But the issue is LoRoad's intent, and the only "conduct" asserted on the part of LoRoad was its payment of $120,000 on November 2, *before* it sent the November 16 marked-up contract to GXV. The Assembly Agreement called for payment of a nonrefundable deposit of $120,000 "at contract signing." On February 25, after GXV asserted that a final contract was in place, Lough emailed that "the Assembly Agreement is NOT yet executed," describing his November 16 version as a "change document," and the $120,000 as "a good faith deposit . . . to demonstrate our seriousness about moving forward on this project." On this record, we agree with the district court that there was simply no conduct by LoRoad that recognized the existence of a binding contract. See FutureFuel, 756 F.3d at 647 ("the parties did not conduct their business in recognition of a valid contractual arrangement").

Finally, LoRoad argues that an enforceable agreement to arbitrate was formed because, "[w]hile there are numerous changes between and among the six versions [of the Assembly Agreement], not a single word of the arbitration provision changed from the first version sent by GXV to LoRoad on October 1, 2012, to the November 16 version executed by GXV." This contention is without merit. While the parties could have executed a free-standing agreement to arbitrate disputes that arose under whatever Assembly Agreement was ultimately signed, there is not a shred of evidence of their intent to do so. Thus, there was an enforceable agreement to arbitrate if, and only if, LoRoad proved there was a final, enforceable Assembly Agreement. As the undisputed evidence showed no such contract was formed, the district court properly granted summary judgment in favor of GXV.

The judgment of the district court is affirmed.

_____