359 P.2d 773

**WESTERN PETROLEUM COMPANY,**
Plaintiff-Appellant,

v.

**ATLANTIC REFINING COMPANY,**
Defendant-Appellee.

No. 6717.

Supreme Court of New Mexico.

Feb. 21, 1961.

---

Rose & Johnson, Hobbs, for appellant.

Hervey, Dow & Hinkle, Lewis C. Cox, Jr., Roswell, for appellee.

MOISE, Justice.

Under date of April 23, 1932, one C. M. Carlson obtained an Oil and Gas Prospecting Permit covering 2560.20 acres of land in Lea County, New Mexico, from the Secretary of Interior. On November 2, 1936, C. M. Carlson, as "Owner," and Anderson-Prichard Oil Corporation, hereinafter referred to as Anderson-Prichard, as "contractor," entered into a drilling and operating agreement covering the 2560.20 acres included in the prospecting permit, whereby Anderson-Prichard was given certain rights of possession and occupancy of the lands for purposes of "prospecting or drilling for, developing, producing and marketing of oil, gas, casinghead gas and kindred substances therefrom." By the terms of this agreement 640 acres described therein was denominated "Preferential (a) Lease" and the balance as "Secondary (b) Lease." We are only interested in the lands included in the "Preferential (a) Lease." The agreement provided that Anderson-Prichard would, on or before December 1, 1936, commence drilling a well in the SW¼NW¼ of Section 21, Twp. 25 S., Rge. 37 E., N.M.P.M., being 40 acres of the "preferential (a) lease" and drill it to 3650 feet unless oil was discovered at a lesser depth or sulphur or salt water encountered.

This well was drilled and oil discovered, whereupon pursuant to the terms of the agreement a lease was obtained from the Secretary of Interior.

Thereupon, as provided in the drilling and operating agreement, Anderson-Prichard received an assignment of 520 acres of the preferential (a) lands, including the 40

acres where the discovery well was located. Under the agreement certain drilling requirements and duties were imposed and assumed. The duties included payment of royalties, and in paragraph 9 provided for other obligations. Since the dispute in this case revolves principally around paragraph 9, it is quoted in full:

"9. Contractor shall, so long as there is a market for oil and/or gas, and the posted price for crude oil in the field is not less than fifty cents (50¢) per barrel, continue with the drilling of wells upon all of said Preferential (a) lands to which he is entitled to drill under the terms of this agreement, at the rate of one well completed to production or abandonment for each and every year, as hereinafter in this paragraph defined, until Contractor shall have drilled upon the Preferential (a) land at least eight wells exclusive of the initial or test well; provided that Contractor may at any time within the first nine months of each such year elect by notice in writing to Owner, not to drill a well during such year, whereupon Owner shall have the right to select from Contractor's Preferential (a) acreage, any undrilled forty acres of land in square form, which forty acre tract shall forthwith be assigned to Owner free and clear of this agreement, whereupon the obligation of Contractor to drill a well upon said land during such year shall terminate. It is understood, however, that in the drilling and operation of said property contractor will always drill any wells reasonably necessary to adequately protect all of the Preferential (a) lands hereby granted to Contractor against drainage. The term 'year' in this paragraph hereinbefore referred to, shall be the period between Feb. 1st of one year and Feb. 1st of the next year, commencing with the 1st day of Feb. 1937. It is further understood and agreed that the C.M.C.J.S.A. oil and gas leases above referred to are issued pursuant to the applicable laws of the United States, and this contract is amenable to said law and the rules and regulations of the Secretary of the Interior promulgated thereunder, and whenever there may be any conflict between this agreement and the rules and regulations of the Secretary of the Interior, such rules and regulations shall govern."

Paragraphs numbered 12 and 23, also being of particular interest, they are likewise quoted in full:

"12. Should Contractor fail or refuse to commence the well herein provided for, or should Contractor fail to complete said well with reasonable diligence, or should Contractor otherwise fail or refuse to perform any of the other conditions in this agreement pro-

vided for Contractor to perform, Owner may, at its option, cancel and terminate this agreement upon written notice to Contractor advising wherein Contractor has failed to comply with this agreement, provided that the Contractor shall thereafter have forty five (45) days, except as to first well where Contractor shall have fifteen (15) days, within which to comply with this agreement in the respect in which default has occurred, and if Contractor shall so comply, this agreement shall remain in full force and effect; otherwise this agreement shall be immediately terminated and Contractor shall execute and deliver to Owner a re-assignment or quitclaim deed of the lands held by Contractor, in such form and to such persons as Owner may designate, whereupon Contractor shall have no further obligations as concerns the lands so reassigned or quitclaimed. In the event of any such termination, Contractor shall be entitled to retain any wells drilled by it and producing on said land, together with an area of forty acres surrounding each such well, said forty acre tracts to be in square form; all of which shall be held, however, subject to performance by Contractor, as concerns the same, of the Contractor's obligations hereunder."

"23. The rights of Contractor under the terms of this agreement shall not be assigned or sublet or otherwise contracted by Contractor unless the assignee, sublessee or person contracting with Contractor shall first sign and deliver to Owner in writing a fuly executed memorandum agreeing to. be bound by the terms and conditions of this agreement as concerns the land in which they are interested."

Thereafter, the interests of Carlson as owner were conveyed to and are now owned by the plaintiff-appellant. In turn, Anderson-Prichard, under date of January 19, 1943, conveyed to the defendant-appellee all of its interest in N½SE¼ of Section 23, Twp. 25 S., Rge. 37 E., N.M.P.M., containing 80 acres, being part of the preferential (a) land. The present action sought to have the court declare all interests of appellee in the 80 acres standing in its name, to be terminated and reverted to appellants pursuant to the terms of paragraph 12 of the November 2, 1936, agreement, and for an order requiring a reconveyance to appellant by appellee of all rights claimed by it. Upon cross motions for summary judgment being considered by the court, the motion of appellee was sustained and this appeal followed.

There is no dispute in the evidence. As stated, the case was decided on motion for summary judgment where the court considered certain answers to interrogatories, the various written instruments and the deposition of the Chairman of the Board of appellant corporation.

To continue with the facts: After execution of the 1936 agreement, and prior to February 1, 1943, Anderson-Prichard drilled three wells and pursuant to the provisions of the contract acquired all lease rights in the three 40-acre tracts on which the wells were located. On February 1, 1943, Anderson-Prichard having failed to drill at least one well each year as required by the 1936 agreement, an instrument denominated Modification of Drilling and Operating Agreement was entered into between them and Indian Petroleum Corporation, being Carlson's successor and appellant's predecessor in interest, whereby it was agreed that all the requirements of sections 9 and 23 of the 1936 agreement quoted above had been complied with or waived and that the contract was in good standing, and further providing that from and after February 1, 1943, paragraph 9 was "changed and modified" to read as follows:

"9. If operations for the drilling of a well are not commenced on or before July 1, 1943, at a location to be selected by Second Party upon some portion of SW—— SE—— or E½ SW—— of Section 23 in Township 25 South, Range 37 East of N.M.P.M., in Lea County, New Mexico, and continued with due diligence and reasonable dispatch until said well shall have been drilled to a maximum depth of 5000 feet or to commercial production at any point between the depth of 4500 feet and 5000 feet, second parties shall transfer and assign all of their right, title and interest in and to the existing oil and gas leases insofar as same cover the 120 acres last hereinabove described and the W½ SW¼ of Section 22 in said Township and range. If said well is drilled in the manner and to the depth above set forth, then, and in that event, if operations are not commenced, within (a) 90 days from and after the date of completion of said well in case said well results in a commercial producer of oil from formations between said depth of 4500 feet and 5000 feet, or (b) 180 days from and after such completion date in case said well is not productive of oil in commercial quantities from said specified formations, for the drilling of a second well at a location to be selected by second parties upon some portion of the remaining 80 acres of the above described 120 acres in said Section 23, and continued with due diligence and reasonable dispatch until such second well shall have been drilled to the depth specified for the drilling of said first well, second parties shall transfer and assign all of their right, title and interest in and to the existing oil and gas leases insofar as same cover such remaining undrilled 80 acres of said Section 23 and said 80 acres of said Section 22; provided, however, that if, within 90 days from

the date of completion of said first well, operations shall have been commenced for the drilling of a well upon either the N½ SE—— of said Section 23 or the E½ SW¼ of said Section 22 and are continued with due diligence and reasonable dispatch to the depth specified for the drilling of said first well, that the time hereinabove allowed for commencement of operations for the drilling of said second well shall be calculated from the date of completion of such well upon either the N½ SE—— of said Section 23 or the E¼ SW—— of said Section 22 instead of the date of completion of said first well; provided further that if after the completion of any such well upon either the N½ SE¼ of said Section 23 or the E½ SW¼ of said Section 22, as hereinabove outlined, any additional well or wells are commenced on either the N½ SE¼ of said Section 23 or the E¼ SW¼ of said Section 22 within 90 days from and after the date of completion of any well drilled upon either of the two tracts last hereinabove described and drilled in the manner and to the depth hereinabove set forth, then the time hereinabove allowed for the commencement of operations for the drilling of said second well by Second Parties shall be calculated from the date of completion of the last such additional wells so drilled upon either of the two tracts last hereinabove described in-

stead of the date of completion of said first well by second parties. If said second well is drilled by second parties in the manner and to the depth above set forth, then, and in that event, if operations are not commenced for the drilling of a third well upon some portion of the remaining 40 acres of the above described 120 acres in said Section 23 and continued with due diligence and reasonable dispatch until such well shall have been drilled to the depth specified for the drilling of said first well, second parties shall transfer and assign all their right, title and interest in and to the existing oil and gas leases insofar as same cover such remaining undrilled 40 acres of said Section 23, and said 80 acres of said Section 22. The interval of time between the date of completion of said second well and the date of commencement of operations for the drilling of said third well shall be calculated in a manner similar to the manner in which the interval of time between the completion of said first well and the commencement of operations for said second well were calculated and determined, taking into account the various factors considered in determining or calculating the interval of time between the completion of said first well and the commencement of said second well. If said third well is drilled by second

parties in the manner and to the depth above set forth, then and in that event, if operations are not commenced for the drilling of a fourth well upon some portion of the W½ of the SW¼ of said Section 22 and continued with due diligence and reasonable dispatch until such well shall have been drilled to a depth specified for the drilling of said first well, second parties shall transfer and assign all their right, title and interest in and to the existing oil and gas lease, insofar as same covers the 80 acre tract last hereinabove described. The interval of time between the date of completion of said third well and the date of commencement of operations for the drilling of said fourth well shall be calculated in a manner similar to the manner in which the interval of time between the completion of said first well and the commencement of operations for said second well were calculated and determined, taking into account the various factors considered in determining or calculating the interval of time between the completion of said first well and the commencement of said second well. If said fourth well is drilled by second parties in the manner and to the depth above set forth, then, and in that event, if operations are not commenced for the drilling of a fifth well upon some portion of the remaining 40 acres of the 80-acre tract last hereinabove described and continued with due diligence and reasonable dispatch until such well shall have been drilled to the depth specified for the drilling of said first well, second parties shall transfer and assign all their right, title and interest in and to the existing oil and gas lease insofar as same covers such remaining undrilled 40 acres of the 80-acre tract last hereinabove described. The interval of time between the date of completion of said fourth well and the date of commencement of operations for the drilling of said fifth well shall be calculated in a manner similar to the manner in which the interval of time between the completion of said first well and the commencement of operations for said second well were calculated and determined, taking into account the various factors considered in determining or calculating the interval of time between the completion of said first well and the commencement of said second well. In case any well drilled by second parties as above provided, is set productive of oil in commercial quantities between the depth of 4500 feet and 5000 feet, nothing herein contained relating to the operations of second parties hereunder shall be construed as in anywise restricting or limiting the right of second parties, at their discretion, to ei-

ther drill deeper and seek production at lower levels or plug back and seek production at upper levels, and in the event of diligent prosecution by second parties of 'deepening' or 'plugging back' operations on any such well, the date of completion of such well shall be deemed to be the date on which such well is completed to production or abandonment. It is further understood and agreed that the oil and gas leases above referred to are issued pursuant to the applicable laws of the United States, and this contract is amenable to said law and the rules and regulations of the Secretary of the Interior promulgated thereunder, and whenever there may be any conflict between this agreement and the rules and regulations of the Secretary of the Interior, such rules and regulations shall govern."

Incidentally, it should be mentioned that in this modification agreement dated February 1, 1943, it is recited that subject to certain rights of El Paso Natural Gas Company under a 1939 contract, "all claims, rights, title and interest of Anderson-Prichard Oil Corporation" in and to the North half of the Southeast quarter of Section 23, Township 25 South, Range 37 East, N.M.P.M. under the 1936 agreement, were owned by the appellee.

After this modification agreement was entered into, Anderson-Prichard drilled one more well which was a dry hole but failed to drill any additional wells as provided in paragraph 9 as revised. Thereafter, the five 40-acre tracts described in the revised paragraph 9 were reassigned by Anderson-Prichard to appellant's predecessor in interest.

Under date of September 18, 1951, by letter agreement, an arrangement was again worked out and pursuant thereto Anderson-Prichard drilled a fifth well.

The court also had before it an operating agreement entered into in 1955 between Indian Petroleum Company, appellant's predecessor in interest, Anderson-Prichard and El Paso Natural Gas Company, in which the oil and gas leasehold rights of Anderson-Prichard in and to the North half of the Southeast quarter of Section 23, Township 25 South, Range 37 East, N.M. P.M., were ratified and confirmed in Anderson-Prichard, and the 80-acre tract was referred to as the "Atlantic Tract." The agreement did contain a reservation to the effect that nothing in it should "in any way affect the ownership of oil rights as between Indian (appellant's predecessor) * * * and Atlantic Refining Company (appellee)." Appellant never questioned appellee's rights to the 80 acres in issue here until June 3, 1958, when it sent a letter notice as provided in paragraph 12 of the 1936 agreement advising that it was exercising its option under that agreement

for failure to drill the wells as required, for failure to protect the lands against drainage and for failure to get a memorandum from assignees agreeing to be bound by the agreement, all as required by the 1936 agreement. This notice was sent within 30 days of the completion of a producing well immediately to the north of the tract here in question and it gave appellee 45 days within which to commence drilling, all as provided in paragraph 23 quoted above. When appellee failed to drill demand was made for reassignment which appellee likewise did not do, and this suit resulted.

Appellant, in its brief, states that the controversy turns upon whether or not appellee's title to the oil rights is subject to the provisions of paragraphs 9 and 12 of the 1936 agreement, quoted above, and whether or not appellant is prevented by the passage of time or its conduct and that of its predecessors from asserting that appellee did take the assignment subject to these provisions. With this statement of the issue appellee generally agrees, but would add into the case the question of the effect of the 1943 modification and whether or not the agreement as so modified has been performed.

Appellee also agrees generally with appellant's statement that it is appellee's position that the 1943 agreement completely absolved Anderson-Prichard or appellee from any responsibility to carry out the drilling program provided by the 1936 agreement or to prevent drainage or to return land to the "owner" under the 1936 agreement on failure to drill after notice to do so. Appellee, however, contends that the drilling of the well in 1943 after execution of the 1943 modification, and the reassignment of the acreage as provided in that agreement constituted complete performance thereof.

In the light of the issues as agreed to by the parties it is clear to us that the first question that we must answer concerns the legal effect of the 1943 modification. If upon consideration of this issue we conclude that all duties had been performed that were required under the contracts of the parties, then it will not be necessary for us to pass upon the question arising out of appellee's pleas of laches, estoppel, statute of limitations, etc. If, on the other hand, we find that under the terms of the agreements of the parties, Anderson-Prichard had defaulted in its contractual undertakings, we must then consider the various defenses based upon conduct of appellant and the passage of time.

The problem arises primarily because in the 1936 agreement Anderson-Prichard undertook to drill eight wells, exclusive of the discovery well, on eight separate 40-acre tracts, in return for which it would gain the oil and gas rights under 480 acres, exclusive of the 40 acres on which the dis-

covery well was located. If all eight wells had been drilled there can be no question that 160 acres, which for lack of a better term we shall call excess acreage, would have been earned by Anderson-Prichard without any drilling thereon. However, there is a deficiency in the contract in that it failed to spell out who would have the rights on the excess acreage in the event all eight wells were not drilled as required by the 1936 contract. Aside from this, the question is presented as to whether or not the 1943 agreement was intended to supply this deficiency. Appellee argues that it was, whereas appellant contends that it was not.

First, it would seem clear, as stated above, that if eight wells had been drilled, one each year for eight years, Anderson-Prichard would have earned the rights not only on 320 acres drilled, but also on 160 additional or excess acres which it was not required to drill. It is not so clear that when the wells were not drilled as contemplated in paragraph 9, if appellant or its predecessors had exercised their right to select an undrilled 40-acre tract and have it assigned to them thus terminating the obligation of Anderson-Prichard to drill during that year, the duty to drill would not have continued until either eight wells were drilled or a 40-acre tract had been reassigned for each year in which a well was not drilled, including the excess acreage. Although, as stated, that this was the inten-

tion of the parties and the effect of the contract is not as clear as we might like, we believe that a careful reading of paragraph 9 in the 1936 agreement leads to such a conclusion.

Also paragraph 12 provides that upon demand, after default, the "Contractor shall execute and deliver to Owner a re-assignment or quit claim deed of the lands held by Contractor." What was meant by the words "lands held by Contractor"? Does this include the lands drilled and on which all rights had been earned? We doubt it, and appellant seems to agree with this. However, we are inclined to the opinion it contemplated all lands which hadn't been earned by drilling should be reconveyed.

When the 1943 modification enters upon the scene what is the effect on this obligation under paragraph 9 of the 1936 agreement? Appellee argues that the 1943 agreement is merely a construction placed by the parties on the 1936 agreement to the effect that paragraph 9 was not intended to merely postpone the duty to drill from year to year, but actually reduced the number of wells to which the owner was entitled by one for each 40 acres selected and reassigned; or, on the other hand, if the 1936 obligations were different, they were superseded and that the limit of appellee's obligation under the 1943 modification was to drill five additional wells or to reconvey

five specified 40-acre tracts, one for each well not drilled, and that this was done. Appellant argues that the obligation to drill the five wells was the same as under the 1936 agreement, except as to time and depth, and that until they are all drilled appellant had a right, upon compliance with paragraph 12 of the 1936 agreement to a reassignment of all undrilled 40-acre tracts, including the excess acreage.

It is with this position of appellant that we do not agree, and apparently the trial court likewise disagreed. First, we would point out that by the 1943 agreement paragraph 9 of the 1936 agreement was "changed and modified to read as follows:" whereupon the new paragraph 9 is set out in full.

In Webster's New International Dictionary (2nd Ed.) "change" is defined as meaning "a succession or substitution of one thing in place of another"; also as "any variation or alteration; a passing from one state or form to another." "Modify" is defined as "to change somewhat the form or qualities of, to alter somewhat, as to *modify* the terms of a contract." See Board of Directors of Lewis Consolidated School District, Cass County v. Board of Education, In and For Cass County, 250 Iowa 1107, 97 N.W.2d 166; Levin v. Hamilton, 240 Mo.App. 764, 218 S.W.2d 131.

Next, and we think this is the most significant point, paragraph 9 in the 1936 agreement provides that upon failure to drill a well in any one year, upon complying with certain conditions, including reassignment of a 40-acre tract "the obligation of Contractor (Anderson-Prichard) to drill a well upon said land during such year shall terminate," thus clearly indicating merely a postponement of the obligation. On the other hand, paragraph 9 as changed and modified spells out the obligations and duties consequent upon failure to drill any of the five wells, this duty being to reassign 200 specified and described acres. If one well was drilled and the other four not drilled, the duty was to reconvey a specified 160 acres, and so on, until if four wells were drilled and one was not, the duty was to reconvey a particular 40-acre tract.

It is interesting to note that in an inter-office memorandum by an officer of Indian Petroleum Corporation to an employee in the year 1946, this same understanding is expressed when it is stated:

"The Modification of Agreement grants to Anderson-Prichard in the event that said first well was a commercial producer, a second well should be started on the described properties within 90 days after the completion of said first well. If said first well proved to be non-productive, or non-commercial, and was abandoned, Anderson-Prichard was granted 180 days from the date of abandonment of said first

well within which to start drilling a second well on said property. In the event Anderson-Prichard did not start a second well, either within the 90 day period or the 180 day period they could relieve themselves of the obligation of said second well or subsequent wells by re-assigning to Indian a forty acre parcel in the above described land in lieu of said well and extend their drilling rights for an additional 180 days, after the date of said assignment."

The conclusion is also supported by an agreement executed by Indian Oil Corporation and Anderson-Prichard on June 3, 1947, in which the following appears:

" * * * in said modification agreement dated February 1, 1943, Paragraph 9 of the original drilling and operating agreement of November 2, 1936, was amended to provide for the drilling of wells or the surrender of acreage back to first party with respect to the undrilled Preferential 'A' acreage then owned by second parties; said undrilled acreage and the ownership thereof, as of said date, being as follows, to-wit:

"1. East Half of Southwest Quarter (E/2 SW/4) of Section 23 in Township 25 South, Range 37 East in Lea County, New Mexico, owned by Anderson-Prichard Oil Corporation.

"2. West Half of Southwest Quarter (W/2 SW/4) of Section 22 and Southwest Quarter of Southeast Quarter (SW/4 SE/4) of Section 23 in said township and range, owned by L. H. Prichard and J. Steve Anderson."

The drilling or reconveyance of undrilled 40-acre tracts as provided in the 1943 agreement, was completed in 1948. The only right to postponement of drilling obligations arose when a well was drilled either on appellee's 80-acre tract, or on another 80-acre tract similarly situated, and this provision never came into play.

As a third and additional consideration, the assignment by Anderson-Prichard to appellees of the 80 acres in issue here was made on January 19, 1943, and purports to be an absolute conveyance subject only to the payment of an overriding royalty and two contracts for development for gas and casinghead gas. On February 1, 1943, the modification agreement was executed. Appellee says this relieved the 80 acres assigned to it from any drilling requirement, if such a requirement ever existed. That Anderson-Prichard should have been interested in accomplishing such an end would seem to be self-evident, and we are convinced that appellant's predecessors, for reasons and considerations sufficient unto themselves, understood and intended the new paragraph 9 to have this effect.

That appellee may be entitled to the benefits of the contract as one on whose behalf and for whose interest the agreement was entered into can hardly be questioned. Hoge v. Farmers Market and Supply Company of Las Cruces, Inc., 61 N.M. 138, 296 P.2d 476. Hamill v. Maryland Casualty Co., 10 Cir. 209 F.2d 338, is particularly interesting and instructive on this proposition as applied in the instant case. See also 4 Corbin on Contracts, § 775, where it is stated, " * * * the fact that the promised performance is one that would beneficially affect the legal relations of the third party has a very considerable evidential weight in determining what the intentions of the promisee were; it also aids the court in determining whether judgment and execution in favor of the third party will attain the result for which the promisee contracted." In addition, appellant in its reply brief concedes that the 1943 agreement was for the benefit of appellee.

To our minds, the language is clear, and permits of only one interpretation, and that is that the new paragraph 9 of the 1943 agreement "changed" and "modified" the original paragraph 9 and was in complete substitution therefor. We do not find anything in the 1943 agreement to support appellant's contention that any waiver of any rights under the 1936 agreement by the 1943 agreement was temporary and conditioned on future performance by Anderson-Prichard. By its terms it was an absolute substitution of rights and obligations without conditions of any kind. No argument is advanced by appellant that such change was not supported by sufficient consideration; accordingly, it is not necessary for us to denominate the 1943 agreement as a novation, accord and satisfaction, release or compliance and settlement as argued by appellee. In re Kellett Aircraft Corporation, D.C., 77 F.Supp. 959; Priest v. Oehler, 328 Mo. 590, 41 S.W.2d 783; 6 Corbin on Contracts, § 1293. We are satisfied that the agreement was a valid modification of the original contract and that paragraph 9 therein was in complete substitution for paragraph 9 in the 1936 agreement and accordingly is entitled to enforcement in court. The authorities hereinabove set forth likewise support this result.

Also, we are satisfied that Anderson-Prichard, having reconveyed the five tracts to appellant as provided by the 1943 modification, although not exactly according to the time schedule therein, oil rights on the 80-acre tract in issue here were earned and vested free from any additional obligation to drill.

In view of the conclusion reached, it is unnecessary for us to consider whether appellee's additional special defenses of statute of limitations, laches, estoppel, and im-

possibility of performance, were meritorious.

■ This leaves only the question of appellee's duty to protect against drainage. Appellant complains that the court did not permit testimony concerning the issue of whether or not appellees failed to drill "any wells reasonably necessary to protect the lands against drainage." The quoted language is from paragraph 9 of the 1936 agreement. However, the language is omitted from the 1943 modification and there is nothing said therein about drilling of wells to protect against drainage. Since we have already determined that the 1943 modification replaced the 1936 original insofar as the obligation to develop the lease was concerned, and since in the 1943 modification no mention is made of protection against drainage, and since appellant disavows any intention to claim the duty was implied, it follows that the trial court did not err in holding that evidence on this claim of the appellant was not necessary or proper.

We find no error in the record, and the appellant's claims to be without merit. Accordingly, the decision of the lower court is affirmed. It is so ordered.

COMPTON, C. J., and CARMODY and CHAVEZ, JJ., concur.

NOBLE, J., not participating.