**GUILD ASSOCIATES, INC., Appellant,**

v.

**PEACEFUL VALLEY LAKE CORPORATION, a Corporation, Respondent.**

No. 54120.

Supreme Court of Missouri,
Division No. 1.

Nov. 10, 1969.

Motion for Rehearing and for Transfer to Court En Banc Denied Dec. 8, 1969.

Mills & Lange, Gary H. Lange, St. Louis, for appellant.

Randolph E. Puchta, Hermann, for respondent.

SEILER, Presiding Judge.

This court-tried case involves a question of claimed accord and satisfaction. Plaintiff corporation sued for $41,167.04 as the balance remaining unpaid on an account for advertising services rendered defendant in promotion of a real estate development around a lake near Owensville, Missouri, There is no contention the services ren-

dered were unsatisfactory or not as agreed. The dispute is not over the account, but the way in which it would be paid. Defendant's answer pleaded it advised plaintiff it could not afford to continue with the advertising program, but plaintiff induced it to continue on the representation plaintiff would accept the conveyance of 10 lots as a credit toward payment of the account; that on July 12, 1966, plaintiff did select 10 such lots, value $28,360, one of which, having a value of $2,500 was accepted by plaintiff; that defendant had tendered and continued to tender the remaining nine lots, of the reasonable value of $25,860, and also tendered the balance of the account, $15,-307.04, in cash. Plaintiff's reply was a general denial. Without making any findings of fact or law, the trial court entered judgment for plaintiff for the difference, $15,-307.04, with interest and costs. Plaintiff appeals.

What actually occurred is far from clear, but following Rule 73.01(b), V.A.M.R. that in court-tried cases, "All fact issues upon which no specific findings are made shall be deemed found in accordance with the result reached", there is support in the record for the following statement:

The advertising campaign started in 1965 or 1966. It ran for a little over a year and, according to the only itemized written exhibit offered in evidence on the subject, totaled $104,752.43, although defendant's president testified he believed it was around $133,000. At any rate, on July 12, 1966, there was a meeting in Owensville between plaintiff's president, Richard Bowman, and defendant's president, Raymond Engelbrecht, and others, for the purpose of discussing the large advertising bill and whether defendant could afford to continue the program. Engelbrecht said the advertising was running $6,000–$7,000 per week but they were only selling one lot per week and sometimes none. Bowman said "not to panic", that "everything will be all right" and "implied he would take some lots * * had implicated that he would take some lots in exchange for some advertising". The record leaves a good deal to be desired as definitely showing that Bowman agreed to anything on behalf of plaintiff. For example, defendant's witnesses testified Bowman would say "he was talking about some lots", that "I'm going to take some lots", that "he would take some lots on the bill", and once Engelbrecht agreed it was fair to assume that Bowman and two men who came to the July 12 meeting with him, Carl Holekamp, a lumber dealer, and Charles Otto, a builder, were in some sort of joint venture to build homes on the lots. However, perhaps it can be found that Bowman was in reality speaking for the plaintiff corporation and that it, through him, agreed to take 10 lots in on the advertising bill at the values for which these lots were offered for sale by the defendant corporation.

Following the close of the July 12 meeting, defendant's salesman showed Bowman and his two associates over the property. The salesman said they wanted lots with "a good view and good building property". According to the salesman, Bowman selected 10 lots. The assigned values on these totaled $28,360. The salesman said Bowman said he would pay cash for two of the lots and the others could go in on the advertising. The salesman also testified Bowman "represented" plaintiff intended to build homes on these lots and resell them and asked the salesman if he would sell for them.

Usually when a lot was sold at Peaceful Valley Lake a sales contract would be typed and signed. This was not done on the occasion when the salesman and Bowman and associates looked at the lots. The salesman's explanation was that it was then too late in the day and the secretary had gone home. The salesman testified that while he had authority to make a sale, the contract was not considered valid until it was signed by Mr. Engelbrecht; that the salesman and Bowman had a verbal agreement and Bowman was to settle with Engelbrecht. Bowman was back a week or 10 days later and a contract was prepared and

signed on one lot, No. 24. No contract was ever signed on the other nine.

The only lot conveyed was No. 24. It was paid for by a $2,502 check, dated August 1, 1966, drawn on an Owensville bank, by "R. W. Bowman, Trustee". The deed from defendant was made to "Richard Bowman, Trustee". The check was deposited by defendant and the proceeds remitted to plaintiff to apply on the account. One of defendant's exhibits was a letter from Bowman to Engelbrecht, dated July 21, 1966, referring to a meeting "yesterday", "regarding the distribution of commission monies to salesman of the lot we are purchasing at Peaceful Valley Lake." Bowman proposed the regular 10% commission would be "withheld until the house and lot are sold" and in addition the salesman would get 8% of the lot purchase price of $2,500, making a total commission of $450. He said the purpose of this arrangement was "to give added incentive when the house is up so that we are not in the position of having to push the sale of our developed property." Engelbrecht testified that while this is what Bowman suggested, defendant did not agree to it.

The 10 lots which the salesman reported to Engelbrecht as having been selected by Bowman were all in Subdivision 1 and ranged in price from a low of $2,095 to a high of $3,695. At an undisclosed date prior to trial defendant corporation sold two of the 10 lots to a third party. There was no explanation given as to why this was done. One was a $3,595 lot and the other a $3,695 lot. Engelbrecht said there were still about 90 lots left in the subdivision; that there were lots of comparable value and location to the two which had been sold, so that the corporation was "ready, able and willing to convey to Guild Associates * * * ten lots to be selected by it." At the start of the trial, defendant's counsel said he wanted to "renew the tender" of "the ten lots referred to in the pleadings". When asked by plaintiff's counsel as to whether he had a warranty deed for the lots, counsel replied "Well,

there is a matter of selection as to some of the lots."

Engelbrecht testified the matter of "conveying these lots", or "accepting these lots toward the payment of this account", "has been discussed on many occasions". He testified that on July 12, 1966, defendant was in a position to tender warranty deeds, free and clear, on the 10 lots, and was in a position to do the same at the time of trial, except as to the two lots, No. 27 and No. 37, which had been sold.

The only witness for plaintiff was its president, Bowman. His testimony was not helpful to defendant. He denied any discussions at the July 12 meeting about cutting down on the advertising unless plaintiff took some lots in on the account or any agreement to apply lots on the advertising bill. His position was that he and his personal associates were interested in putting up a "pilot" house, selling it at a profit and accumulating other lots as they progressed; that they did look at some locations, decided on one lot at $2,500 and there was some talk that if they would take two, the price for the two would be $4,500; that the 10 lots discussed were lots "to build houses on which we would pay for."

It cannot be told from the record just what the unpaid balance was on July 12, 1966, the day of the meeting. As of June 20, 1966, the account seems to have been $14,362.45. Between June 24 and July 11, 1966, defendant made payments totaling $13,000. The account then ran $26,902 in July, $28,474 in August, $19,245 in September, and $11,706 in October. It dropped to $3,025 in November and closed with $1,034 in January 1967. In the meantime, from July 19 until December 2, 1966, defendant paid $37,500, and at some date after June 14, 1967, made further payments, reducing the account to the amount sued for of $41,-167.04.

Turning to the law involved, it is, of course, possible for a debtor and creditor to agree that all or part of an amount due will be paid in something other than money.

" * * * An accord is a contract * * * between creditor and debtor for the settlement of the claim by some performance other than that which is due * * * " Restatement of the Law of Contracts, Sec. 417, Vol. II, p. 785–6. Here there was a running open account for advertising services between plaintiff and defendant on which defendant had been making payments from time to time as the services continued. There is no legal reason why the two could not agree that plaintiff would take some of defendant's lots at a stated price in lieu of that much of the balance due on the account. Plaintiff, which would ordinarily be entitled to payment in money, would be accepting property in satisfaction of part of the account, and defendant would be discharging part of its obligation on the account by making a payment in lots, Bohle v. Sternfels (Mo.Sup.) 261 S.W.2d 936.

This could have been done by defendant's actually conveying the 10 lots to plaintiff and plaintiff's giving credit for the agreed price accordingly. It would then have been an accomplished fact and that portion of the account would have been finally discharged. The accord and satisfaction would have been a bar to that portion of the account, had plaintiff later sought to obtain a money judgment on it.

■ Here, however, the accord and satisfaction, if it existed, was executory. If it is to be a partial bar to plaintiff's suit on the account it must rest upon plaintiff's having agreed to accept defendant's agreement to convey the 10 lots at the designated prices in exchange for plaintiff's agreeing to consider as satisfied an equivalent part of the balance due on the account. This, too, is possible legally. A creditor can accept the mere promise of the debtor as satisfaction of the debt. He can accept the new promise, instead of performance, as satisfaction, Priest v. Oehler, 328 Mo. 590, 41 S.W.2d 783, 788; Sandau v. McLaughlin (Mo.App.) 359 S.W.2d 376, 379. The law is well stated in 1 Am.Jur.2d Accord and Satisfaction, Sec. 51, p. 347, thus:

"The rule that the new promise, if unexecuted, is not a satisfaction is subject to the qualification that when the parties agree that the promise shall be a satisfaction of the prior debt or duty, and the new agreement is based upon a good consideration and is accepted in satisfaction, then it operates as such, and bars an action on the old obligation. In such cases a new obligation is created, to be performed according to its terms, and it is execution and delivery of that agreement, or the meeting of the minds of the parties upon its terms, that constitutes a satisfaction of the prior debt or demand. The creditor is then confined to his remedy for the nonperformance of the new agreement, for a breach of which an action lies. However, in order that the accord shall operate as a discharge of the original debt, the creditor must have agreed to accept the new promise itself, and not demand the performance of it as a satisfaction for his claim, and the new agreement must be based upon a consideration * * * "

■ This, in effect, is what the trial court found occurred here in giving plaintiff a money judgment only for the amount remaining unpaid on the account, $15,307.-04, with interest and costs, after deducting the price put on the lots, $28,360.

The difficulty with accepting this conclusion is that the parties did not so conduct themselves on July 12, 1966, when the accord and satisfaction is claimed to have occurred, or so evidence their intention at a time when there was no litigation involved. Even from defendant's witnesses, the entire arrangement is characterized by a lack of precision and definiteness. Many factors which are important to any real estate transaction were not mentioned. There was no time set for the conveyance of the lots or closing of the transaction. No arrangements were made for plaintiff to examine the state of defendant's title. No contract was signed, except as to one lot and that was signed by Bowman personally and not by plaintiff corporation.

Bowman's letter of July 21, 1966, deals with the subject of commissions to the salesman. While defendant did not agree to Bowman's suggestion as to how the commission should be handled, it is clear the letter refers only to one lot, not 10, yet defendant made no issue of this, which is not consistent with its claim that 10 lots were involved. Nor is it clear why there should be any discussions over commissions if there actually was agreement reached that plaintiff would take defendant's promise to convey 10 lots as part payment on the account. There would be no reason under such an arrangement for plaintiff to be concerned with commissions to defendant's salesman. As the record is studied, the conviction grows that the best that can be said for defendant's position is that the accord and satisfaction, if there was one, was at all times executory—that it would mature into a satisfaction only when defendant actually conveyed the 10 lots free and clear to plaintiff, something which has not been done and which cannot under the evidence be done, and that there never was a completed accord and satisfaction based on plaintiff's accepting defendant's promise to convey, rather than performance itself.

Defendant corporation certainly did not conduct itself as though it had promised to convey 10 selected lots to plaintiff in exchange for a pro rata payment of the account, because defendant subsequently conveyed two of the highest priced and presumably, therefore, the most desirable of the lots to some third party. Defendant must not have considered there was any finality as to payment of the account by taking specific lots. Defendant's conduct shows the matter did not get beyond the stage that defendant was willing to convey the lots if plaintiff were willing to take them. If defendant had a firm agreement from plaintiff to take defendant's promise to convey the 10 particular lots as part payment on the account, there would be no reason for defendant to put it outside its power to comply with the agreement by conveying two of the lots to an outsider. It is consistent with there having been a

plan on the part of Bowman and his two associates to build and sell houses as investments, financing them one at a time, buying the lots as they got ready for them from the 10 they looked at, but without actually signing a contract for all in advance. This would permit Bowman and his associates to make a profit and at the same time bring money to the defendant from the sale of lots which could be used to pay on plaintiff's bill. This would also leave defendant free to sell the lots to others if they had a chance to do so before Bowman and associates were ready for them, which is what defendant did.

There is also the matter of the way payment was made and title taken on the one lot actually conveyed. Payment was by a check signed by R. W. Bowman, Trustee. Title was taken in the name of Richard Bowman, Trustee. Bowman said this was because the money came from him and Holekamp personally in equal amounts and the lot was to be used for their building a house for sale. There was a house built on this lot. There was no other explanation offered for this handling of the lot, which is admittedly one of the 10. Such handling is not consistent with plaintiff's having accepted defendant's promise to convey 10 lots to it in lieu of payment of an equal part of the account.

Another unlikely element inheres in the fact that there was a deed of trust against the entire development. The developer, defendant corporation, had an arrangement with the security holder for a release on particular lots as sold and Mr. Engelbrecht testified the corporation was in a position to get a release on the 10 lots, although they had not been released on July 12, 1966, and would not have been "until after they had been purchased". It strains credulity to believe plaintiff was willing to accept defendant corporation's mere promise to convey 10 lots as payment of a sizeable amount of the account. Even with the best of intentions on the part of defendant, it might not have been able to produce a release from the deed of trust on the 10 lots.

Defendant corporation was having difficulty paying its bill. The security holder might be chary of releasing 10 lots with no cash being generated in the transaction, part of which he could insist be applied to his note as his price for the release. Yet plaintiff would have to run all these risks if it accepted defendant's promise to perform as pro tanto discharge of the account. The promise might be worthless no matter how honest defendant was in its intentions. In Restatement of the Law of Contracts, Sec. 419, Vol. II, p. 789–90, it is said, "Where a contract is made for the satisfaction of a pre-existing contractual duty, or duty to make compensation, the interpretation is assumed in case of doubt, if the pre-existing duty is an undisputed duty * * * to pay a liquidated sum of money, that only performance of the subsequent contract shall discharge the pre-existing duty * * *" The Restatement goes on to explain in a Comment that " * * * Where the debt is liquidated or the claim is overdue, the creditor generally will not enter into a bargain for an immediate cancellation of his claim without obtaining satisfaction and not merely a promise of it * * *" So, here, plaintiff's claim was on an undisputed, overdue open account. It seems unlikely that plaintiff would have agreed to an immediate cancellation of over $28,000 on such overdue account without actually obtaining at the same time a conveyance of the 10 lots with a release from the deed of trust and not merely a promise that defendant would convey free and clear at some unspecified future date.

For the present judgment to be affirmed it must appear that plaintiff agreed to accept defendant's mere promise to convey in satisfaction of the main part of its account. We do not believe defendant proved any such agreement by plaintiff, and that the court's judgment reaching a contrary result is clearly erroneous and must be set aside. The judgment is therefore reversed and the cause remanded with directions to set aside the present judgment and to enter a new judgment against defendant as of the date of the original judgment, June 3, 1968,

in the amount of $44,474.10, being the full amount of the account together with accumulated interest thereon from the date of demand to the date of judgment, said new judgment to draw interest from and after June 3, 1968.

HOLMAN, J., and HENLEY, Alternate Judge, concur.